**PENNSYLVANIA POWER COMPANY, Petitioner**

v.

**PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 11, 2007.

Decided Aug. 21, 2007.

John F. Povilaitis, Harrisburg, for petitioner, Pennsylvania Power Company.

Shane Rooney, Asst. Counsel, Harrisburg, for respondent, PA Public Utility Commission.

Scott Perry, Asst. Counsel, Harrisburg, for intervenor, Department of Environmental Protection.

Todd S. Stewart, Harrisburg, for intervenor, Dominion Retail, Inc.

BEFORE: LEADBETTER, President Judge, and COLINS, Judge, and McGINLEY, Judge, and SMITH–RIBNER, Judge, and PELLEGRINI, Judge, and FRIEDMAN, Judge, and SIMPSON, Judge.

OPINION BY President Judge LEADBETTER.

The Pennsylvania Power Company (Penn Power) petitions for review from the orders of the Pennsylvania Public Utility Commission (PUC) entered on April 28, 2006 and May 4, 2006, which denied Penn Power use of a proposed interim rate reconciliation mechanism, as well as, in the alternative, a proposed risk-shifting mechanism, through which Penn Power sought to fully recover its costs as a provider of last resort,[1] and which also denied Penn Power access to alternative energy projects located within the PJM Interconnection, LLC (PJM)[2] service territory but

1. With respect to Penn Power's provider of last resort obligations, Section 2807(e)(3) of the Electricity Generation Customer Choice and Competition Act, provides the following:

If a customer contracts for electric energy and it is not delivered or if a customer does not choose an alternative electric generation supplier, the electric distribution company or commission-approved alternative supplier shall acquire electric energy at prevailing market prices to serve that customer and shall recover fully all reasonable costs. 66 Pa.C.S. § 2807(e)(3). We note that the General Assembly recently amended Section 2807(e) of the Electricity Generation Customer Choice and Competition Act. See Act of July 17, 2007, Act No. 2007–36.

2. PJM is a regional transmission organization (RTO) that operates and manages the trans-

mission grids of most Pennsylvania electric utilities as well as electric utilities in Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Tennessee, Virginia, West Virginia, and the District of Columbia. "Regional transmission organization" is defined by the Section 1648.2 of the Alternative Energy Portfolio Standards Act, Act of November 30, 2004, P.L. 1672; 73 P.S. § 1648.2, as "[a]n entity approved by the Federal Energy Regulatory Commission (FERC) that is created to operate and manage the electrical transmission grids of the member electric transmission utilities as required under FERC Order 2000, Docket No. RM99–2–000, FERC Chapter 31.089 (1999) or any successor organization approved by the FERC." PJM is headquartered in Valley Forge, Pennsylvania. The other RTO in Pennsylvania is the Midwest Indepen-

outside the Commonwealth. Penn Power is an electric distribution company[3] subject to the requirements of both the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa. C.S. §§ 2801—2812, and the Alternative Energy Portfolio Standards Act (AEPS Act), Act of November 30, 2004, P.L. 1672, *as amended,* 73 P.S. §§ 1648.1–1648.8.[4] Penn Power argues that the PUC erred in denying its proposed reconciliation mechanism because Section 2807(e)(3) of the Competition Act provides that Penn Power "shall recover fully all reasonable costs." 66 Pa.C.S. § 2807(e)(3). In addition, Penn Power contends that the PUC's order denying access to certain alternative energy projects outside the Commonwealth violates the Commerce Clause of the United States Constitution and is contrary to the plain language of Section 4 of the AEPS Act, 73 P.S. § 1648.4. We vacate and remand in part and reverse in part.

Penn Power's electric generation rate caps expired on December 31, 2006. In October of 2005, Penn Power filed a petition with the PUC requesting approval of its Interim PROVIDER OF LAST RESORT Supply Plan (Interim Plan) for the interim transition period of January 1, 2007 to May 31, 2008.[5] Under the terms of its Interim Plan, Penn Power would offer fixed rate provider of last resort service to all its retail customers, subject to reconciliation. Penn Power would obtain its electricity supply from wholesale suppliers through a competitive bidding process.

Under the cost reconciliation mechanism it proposed, at the end of each month Penn

---

dent Transmission System Operator, Inc. (MISO), headquartered in Carmel, Indiana, which serves the transmission needs in portions of thirteen Midwestern states, Pennsylvania, and one Canadian province.

3. Section 2803 of the Electricity Generation Customer Choice and Competition Act defines an "electric distribution company" as:

The public utility providing facilities for the jurisdictional transmission and distribution of electricity to retail customers, except building or facility owners/operators that manage the internal distribution system serving such building or facility and that supply electric power and other related electric power services to occupants of the building or facility.

66 Pa.C.S. § 2803. Section 2 of the Alternative Energy Portfolio Standards Act, Act of November 30, 2004, P.L. 1672; 73 P.S. § 1648.2, provides that the term "electric distribution company" shall have the same meaning under the AEPS Act as it does under the Competition Act.

4. We note that the General Assembly recently amended the AEPS Act. *See* Act of July 17, 2007, Act No. 2007–35.

5. Penn Power's petition was filed pursuant to the Competition Act and Section 5.41 of the Pennsylvania Code, 52 Pa.Code § 5.41. The Office of Trial Staff (OTS) filed a notice of appearance. The Office of Small Business Advocate (OSBA) and Office of Consumer Advocate (OCA) filed answers to the petition and notices of intervention. The following filed petitions to intervene in the proceeding before the ALJ: FirstEnergy Solutions Corp. (FES); Exelon Corporation (Exelon), on behalf of its subsidiaries, PECO Energy Company (PECO Energy) and Exelon Generation Company, LLC (ExGen); Constellation NewEnergy, Inc. (CNE) and Constellation Energy Commodities Group, Inc. (CCG) (collectively, Constellation); Dominion Retail, Inc. (Dominion); the Pennsylvania Department of Environmental Protection (DEP); Strategic Energy, L.L.C.; Reliant Energy, Inc. (Reliant); Penn Power Users Group (PPUG) and Industrial Energy Consumers of America (IECPA) (collectively, PPUG/IECPA); and Duquesne Light Energy LLC. Direct Energy Services, LLC (Direct Energy) and Retail Energy Supply Association (RESA) filed answers to the petition. Penn Power subsequently filed an answer opposing the petitions of Exelon and PECO Energy to intervene in the proceedings. Exelon and Peco Energy withdrew their petitions to intervene following the ALJ's denial of their petitions.

Power would compare its retail customer provider of last resort costs incurred with its corresponding billings during that month, excluding applicable Pennsylvania gross receipts tax. Any over or under collection of expenses for the month would be recorded on Penn Power's books of account. Interest charges would accrue on the amount of over or under collection, calculated on the average cumulative balances at the beginning and end of the month. Interest would be accrued (or credited) based on Pennsylvania's statutory interest rate. The cumulative over or under collection would be reported on a quarterly basis and would be used as a basis for adjustment of subsequent bills to customers. If the PUC chose to deny Penn Power use of its reconciliation mechanism, Penn Power proposed, in the alternative, that it be allowed to transfer the risk of the collection of insufficient revenues to wholesale suppliers by making the terms of their payment whatever Penn Power could collect from its customers. Under this scenario, wholesale suppliers would be expected to incorporate this under-collection risk into their bids.[6]

The Interim Plan also dealt with Penn Power's obligation to obtain sources of alternate energy under the AEPS Act. Under Section 3 of the Act, a portion of the electric energy that Penn Power sells to retail electric customers in the Common-

wealth must be electricity generated from alternative energy sources.[7] 73 P.S. § 1648.3. Section 4 of the Act provides, in pertinent part, that "[e]nergy derived only from alternative energy sources inside the geographical boundaries of this Commonwealth or within the service territory of any Regional Transmission Organization [(RTO)] that manages the transmission system in any part of this Commonwealth shall be eligible to meet the compliance requirements under this act." 73 P.S. § 1648.4. As noted below, there are two RTOs in Pennsylvania, PJM and MISO. Penn Power is located within MISO's service territory. Based upon the statutory language, Penn Power argued that it was entitled to obtain its required alternative energy from sources outside the Commonwealth in PJM's territories as well as MISO's.

After an evidentiary hearing, an Administrative Law Judge (ALJ) recommended approval of Penn Power's Interim Plan with some modifications.[8] Notably, the ALJ recommended approval of a reconciliation mechanism for Penn Power to recover its provider of last resort costs. The ALJ also recommended that renewable energy projects located anywhere within the service territories of PJM or MISO be eligible to meet Penn Power's requirements under the AEPS Act. Exceptions

---

6. This argument is not asserted on appeal. Penn Power has since conceded that the necessity to Penn Power to contract with wholesale suppliers in time for provider of last resort service to be provided to customers commencing on January 1, 2007 now precludes PUC implementation of any cost recovery approach that involves contractually shifting the risk of under-collection to wholesale suppliers, thus implementation of its alternative risk-shifting mechanism is no longer feasible.

7. Section 2 of the AEPS Act defines "alternative energy sources" to include such alterna-

tive sources as: solar, hydropower, geothermal, biomass, methane, fuel cells, waste coal, demand-side management, and distributed generation system. 73 P.S. § 1648.2

8. Penn Power's Interim Plan was modified by the ALJ to include a maximum acceptable price, to include a contingency plan that does not rely solely on spot market purchases and which allows additional solicitation and bilateral negotiations, and to provide that Penn Power use the Pennsylvania statutory rate of six percent to calculate the interest allowance on reconciliation of over/under collections.

and Reply Exceptions were filed to the ALJ's decision.

The PUC issued an opinion dated April 28, 2006 adopting the ALJ's recommendation to approve Penn Power's Interim Plan with some modifications. With respect to Penn Power's proposed reconciliation mechanism, the PUC stated:

We believe that a competitive market will not develop if an incumbent utility has the ability to reconcile its POLR costs and the competition does not enjoy the same risk free floating rate design. While we agree that on a month-to-month basis, the cost of purchased POLR supply will not equal the billed and collected revenue for delivered POLR supply, a quarterly reconciliation will not send the proper price signal to customers who either have not chosen an alternate supplier or have elected to remain with the EDC for their electric service.... If Penn Power were permitted to earn interest on under collected administrative costs or on under collected POLR acquisition costs, it would be enjoying more than the full recovery of reasonable costs. Based upon the foregoing discussion, we shall deny Penn Power's proposed reconciliation mechanism.

PUC April 28, 2006 opinion at 100–101.

With respect to whether Penn Power could access renewable energy projects which are located within the PJM service territory but outside the Commonwealth, the PUC determined that the geographic eligibility test contained in Section 4 of the AEPS Act was ambiguous. Therefore, based upon its view of the General Assembly's intent,[9] the PUC ordered that only

---

9. In ascertaining the General Assembly's intent, the PUC commented:

On the meaning of Section 4 as it applies to this case, one interpretation of Section 4 has been referred to as the "intra-RTO delivery requirement." This interpretation stresses the words "only" and "in any part" in the third sentence of the section. As we stated in our AEPS Tentative Order:

The General Assembly's use of the ... word "only" could be interpreted to narrowly construe the geographic eligibility limits that follow in this sentence. Specifically, "only" could be linked with the phrase "in any part" to limit energy for compliance purposes from out-of-state resources in MISO and PJM to those portions of the same RTO service territory in Pennsylvania. Thus a facility located in the MISO service territory in Ohio would "only" qualify for alternative energy system status in the Penn Power service territory, as that is the only portion of MISO that is "in any part" of the Commonwealth of Pennsylvania.

The Legislature apparently intended to ensure that the Penn Power service territory, despite its small size compared to the areas and numbers of customers served by other Pennsylvania EDCs, not be left bereft of the benefits of the AEPS Act (because PJM did not manage the transmission system in that service territory while doing so in the remainder of the Commonwealth, except for a small portion of Pike County). With no intention of expanding eligibility so broadly as effectively to deny those benefits to the vast remainder of the Commonwealth, the Legislature qualified MISO alternative energy facilities by including that RTO within the definition of "regional transmission organization" and by referring in Section 4 to a defined RTO managing "any part of" the transmission system in Pennsylvania. The Penn Power service territory was "taken care of" by qualifying *for that service territory* alternative energy facilities in the huge MISO, a very small *part* of which included Penn Power's service territory.

The alternative interpretation—that alternative energy facilities located within the MISO region qualify in every Pennsylvania EDC service territory—cannot have been the Legislature's intention. The Legislature hardly would have imposed the higher costs of producing alternative energy upon Pennsylvania's electricity ratepayers—especially at the same time that the rate caps from electric generation restructuring settlements were expiring and opening the

alternative energy sources located within Pennsylvania or the service territory of MISO are eligible to meet Penn Power's compliance requirements under the AEPS Act.[10]

Penn Power filed a petition requesting clarification of the PUC's April 28, 2006 opinion. In its opinion dated May 4, 2006, the PUC clarified that it was its intent in its prior opinion also to deny Penn Power use of its risk-shifting mechanism.[11] The PUC commented:

> Wholesale suppliers do not have the necessary information to assess the risk of the mismatch in costs and revenues, *i.e.*, customer usage per rate block.... In

way to higher electric rates—when the laws of most states in MISO's region provided no reciprocal qualification for alternative energy facilities constructed in Pennsylvania. In other words, if the alternative interpretation is adopted, Pennsylvania ratepayers would pay for MISO alternative energy facilities with little or no commensurate economic (*i.e.*, the financial fruits of construction projects in Pennsylvania) or environmental (*i.e.*, cleaner Pennsylvania air) benefits to them. Moreover, it is highly unlikely that the Legislature would have diluted the anticipated benefits of the AEPS Act for 97% of Pennsylvania ratepayers for the sake of the 3% of Pennsylvania's electric ratepayers in Penn Power's service territory.

In contrast, the Legislature apparently decided that expanding eligibility to alternative energy projects in states within the large PJM footprint was qualification enough. This balancing of interests is commensurate with Pennsylvania's seventy-year affiliation with PJM, which is based in Valley Forge, and with the physical infrastructure of that RTO, which would more likely ensure that power from that grid is delivered to Pennsylvania ratepayers. For that reason alone, the Legislature surely wished to promote system reliability in PJM by encouraging construction of alternative energy projects in that RTO, but was less concerned to do so in MISO's territory.
PUC April 28, 2006 opinion at 139–141 (footnotes omitted).

the event of significant under-recovery, *i.e.*, supplier default, Penn Power may of course petition the Commission for recovery of any prudently incurred costs pursuant to 66 Pa.C.S. § 2807(e)(3).

PUC May 4, 2006 opinion at 6.

■ On appeal, Penn Power argues that the PUC erred 1) in denying Penn Power use of its proposed reconciliation mechanism and 2) in denying access to alternative energy projects located within the PJM service territory but outside the Commonwealth.[12] With respect to the Competition Act, Penn Power argues that the PUC orders prevent Penn Power from recovering fully all reasonable costs

10. Commissioners Pizzingrilli and Fitzpatrick dissented from the PUC's April 28, 2006 order, agreeing with *Penn Power's* interpretation of the AEPS Act.

11. Commissioner Fitzpatrick also dissented from the PUC's May 4, 2006 order as he believed that because the PUC had denied Penn Power proposal to establish a reconciliation mechanism, it must allow Penn Power to transfer the risk of under-collection of provider of last resort costs to wholesale suppliers.

12. Based upon the issues raised, our review is limited to determining whether the PUC erred as a matter of law or abused its discretion. *Susquehanna Area Reg'l Airport Auth. v. Pennsylvania Pub. Util. Comm'n*, 911 A.2d 612, 616 n. 6 (Pa.Cmwlth.2006). DEP also petitioned for review of the PUC's April 28, 2006 order, arguing that the PUC erred in finding that an EDC's compliance with the AEPS Act may be satisfied by acquiring alternative energy credits without also acquiring and delivering electricity from alternative energy sources to retail customers. DEP's appeal has been discontinued, so that issue is not before us. Penn Power has also moved to quash DEP's notice of intervention in this appeal. We believe DEP has established its standing to participate in support of the PUC's decision based upon its duties under the AEPS Act. Because it has discontinued its separate appeal, we need not determine whether it was aggrieved by other aspects of the order so as to give it standing to appeal in its own right.

incurred serving provider of last resort customers. Specifically, Penn Power contends that the PUC's denial of a reconciliation mechanism is in conflict with the plain meaning of Section 2807(e)(3) of the Competition Act, that the use of a reconciliation mechanism does not violate Section 2807(e)(3)'s mandate that an EDC acquire energy at "prevailing market prices," and that the PUC's policy concern that allowing Penn Power's reconciliation mechanism will impair the competitive market cannot trump the statutory mandate of Section 2807(e)(3). With respect to the AEPS Act, Penn Power argues that the PUC orders are ripe for review, that the PUC's decision is contrary to the plain language of Section 4 of the AEPS Act, and that the PUC's interpretation violates the Commerce Clause of the United States Constitution.

### 1. Whether the PUC erred in denying Penn Power use of its proposed reconciliation mechanism?

■ As noted above, the PUC denied both of the alternatives which Penn Power proposed to obtain full cost recovery. As has often been noted, "[a]s the administrative body charged with implementing the Competition Act, the PUC is entitled to substantial deference in the performance of its duties, and the PUC's interpretation of the Competition Act should not be overturned unless it is clear that such construction is erroneous." *George v. Pennsylvania Pub. Util. Comm'n,* 735 A.2d 1282, 1288 (Pa.Cmwlth.1999). Further, "[w]hen the statutory language is not explicit a court may defer to an administrative agency's interpretation in order to ascertain legislative intent." *Dominion Retail, Inc. v. Pennsylvania Pub. Util. Comm'n,* 831 A.2d 810, 814 (Pa.Cmwlth.

2003). However, where statutory language is clear, such interpretive discretion ends and the agency must abide by the statute.

■ With respect to Penn Power's provider of last resort obligations, as noted above, Section 2807(e)(3) of the Competition Act provides that Penn Power "shall recover *fully* all reasonable costs." 66 Pa. C.S. § 2807(e)(3) (emphasis added). In its May 4, 2006 opinion, the PUC specified that "[i]n the event of *significant* under-recovery, *i.e.,* supplier default, Penn Power may of course petition the Commission for recovery of any prudently incurred costs pursuant to 66 Pa.C.S. § 2807(e)(3)." PUC May 4, 2006 opinion at 6 (emphasis added). In dissent, Commissioner Fitzpatrick opined:

> This reasoning errs for two reasons. First, it is unclear what constitutes "significant under-recovery"; however, anything less than full recovery violates the statute. Second, if the Commission allows Penn Power to later adjust its POLR prices due to under-recovery of costs, the result is the same as if the Commission had adopted Penn Power's reconciliation mechanism.

Dissenting Statement, May 4, 2006. We agree with Commissioner Fitzpatrick that the language used by the PUC majority is less than clear, and that the statutory language is quite explicit in mandating full recovery, not just "significant" recovery. Compounding the ambiguity of the Commission's position, at oral argument in April of 2007, its counsel stated that if at the end of the seventeen month transition period Penn Power can show that it has not fully recovered its costs, it is free to petition the PUC for recovery.[13] Moreover, we note that the Commission's policy

---

13. Based on this ambiguous possibility of future relief, counsel argued that review of this issue is premature. We disagree. In planning its future record-keeping, contracts,

on reconciliation mechanisms appears to have changed since the time of its decision in 2006.[14]

Under these circumstances, we believe a remand is necessary. While we agree with Penn Power that it is entitled to full recovery of its reasonable costs as a provider of last resort, it is not for this court to dictate the mechanism or the timing by which that end is to be accomplished.[15] We believe the Commission should have the opportunity to make this determination in the first instance, and so will remand in order that it may provide for a cost recovery mechanism which complies with the statutory directive.

2. **Whether the PUC erred in denying Penn Power access to alternative energy projects which are located within the PJM service territory but outside the Commonwealth?**

■ Pursuant to Section 7(a) of the AEPS Act, the PUC is charged with carrying out the responsibilities of the AEPS Act.[16] 73 P.S. § 1648.7. Thus, its interpretation of the AEPS Act is entitled to great deference and will not be reversed unless clearly erroneous. *See Popowsky v. Pennsylvania Pub. Util. Comm'n,* 550 Pa. 449, 462, 706 A.2d 1197, 1203 (1997). However, when interpreting provisions of a statute, "and the language of the statute is clear and unambiguous, a court need go no further to discern the legislature's intent.... Further, the plain words of the statute may not be ignored...." *Elite Indus., Inc. v. Pennsylvania Pub. Util. Comm'n,* 574 Pa. 476, 482, 832 A.2d 428, 431 (2003) (citation omitted); 1 Pa.C.S. § 1921(b). We conclude that Section 4 of the AEPS Act is unambiguous; thus, we must give effect to the plain meaning of the statute. As noted above, Section 4 provides, in pertinent part, that "[e]nergy derived only from alternative energy sources inside the geographical boundaries of this Commonwealth *or* within the service territory of

marketing, etc., it is entitled to know the framework under which it can seek to enforce its statutory right to cost recovery, if such measures become necessary.

14. The PUC entered an Advance Notice of Final Rulemaking Order and a Proposed Policy Statement in February of 2007 after a public meeting. In these orders, the PUC made significant changes to the proposed regulations it had issued in December of 2004, which included a prohibition on reconciliation. The PUC now strongly encourages the use of reconciliation in order to ensure that a default service provider (DSP), also known as a provider of last resort, fully recovers its reasonable costs. The PUC still maintains, however, that reconciliation is not mandated, consistent with its prior position. While informative of the PUC's current views regarding reconciliation in the provider of last resort context, these orders are irrelevant for purposes of resolving this case, as they were not part of the record before the PUC when it issued its April 28, 2006 and May 4, 2006 opinions. Furthermore, these orders are not final determinations. The PUC anticipated that it would conclude the default service rulemaking by mid–2007. Section 2807(e)(2) of the Competition Act provides that "[a]t the end of the transition period, the commission shall promulgate regulations to define the electric distribution company's obligation to connect and deliver and acquire electricity under paragraph (3) [of Section 2807(e)] that will exist at the end of the phase-in period."

15. While we agree that the use of a reconciliation mechanism does not violate Section 2807(e)(3)'s mandate that an EDC acquire energy at "prevailing market prices," there are no provisions in the Competition Act or in the Public Utility Code that explicitly require use of a reconciliation mechanism to ensure an EDC recovers fully all reasonable provider of last resort costs.

16. DEP also has certain responsibilities under the AEPS Act. *See* 73 P.S. §§ 1648.6, 1648.7(b), 1648.7(c). DEP agrees with the PUC's interpretation of Section 4 of the AEPS Act with respect to the geographic eligibility test.

*any* regional transmission organization that manages the transmission system in *any part of this Commonwealth* shall be eligible to meet the compliance requirements under this act." 73 P.S. § 1648.4. (emphasis added). The plain language of the statute does not restrict access to out-of-state alternative energy projects to only those that are within the same service territory as the distribution companies. Thus, the PUC improperly engaged in a legislative intent analysis. As such, we conclude that the PUC's interpretation of Section 4 of the AEPS Act was erroneous. For the foregoing reasons, the PUC's decision to refuse to allow Penn Power's proposed cost recovery mechanisms is vacated and the case is remanded on this point. Its decision denying Penn Power access to alternative energy projects located in the PJM service territory but outside the Commonwealth is hereby reversed.[17]

Judge SMITH–RIBNER and Judge SIMPSON concur in the result only.

**17.** Because we determine that Section 4 of the AEPS Act is unambiguous and allows Penn Power to access alternative energy projects located within the PJM service territory but outside the Commonwealth, we need not reach the issue of whether the PUC's interpretation of Section 4 of the AEPS Act violates the Commerce Clause. In addition, as noted above, the General Assembly recently amended the AEPS Act. *See* Act of July 17, 2007, Act No. 2007–35. In particular, the General Assembly amended Section 4 of the AEPS Act, which now provides the following, in pertinent part:

> Energy derived from alternative energy sources inside the geographical boundaries of this Commonwealth shall be eligible to meet the compliance requirements under this act. Energy derived from alternative energy sources located outside the geographical boundaries of this Commonwealth but within the service territory of a regional transmission organization that manages the transmission system in any part of this Commonwealth shall only be

*O R D E R*

AND NOW, this 21st day of August, 2007, the orders of the Public Utility Commission in the above captioned matter are hereby VACATED and the case is REMANDED only with respect to their denial to Penn Power of the use of a reconciliation mechanism, and REVERSED only with respect to their restriction of Penn Power's access to alternative energy projects located in the PJM service territory but outside the Commonwealth. Penn Power's motion to quash DEP's notice of intervention is hereby DENIED.

Jurisdiction relinquished.

> eligible to meet the compliance requirements of electric distribution companies [(EDCs)] or electric generation suppliers [(EGSs)] located within the service territory of the same regional transmission organization. For purposes of compliance with this act, alternative energy sources located in the PJM Interconnection, L.L.C. regional transmission organization (PJM) or its successor service territory shall be eligible to fulfill compliance obligations of all Pennsylvania electric distribution companies and electric generation suppliers. Energy derived from alternative energy sources located outside the service territory of a regional transmission organization that manages the transmission system in any part of this Commonwealth shall not be eligible to meet the compliance requirements of this act.

Thus, under the AEPS Act as it has been amended, Penn Power may access alternative energy sources located in the PJM service territory but outside of the Commonwealth to satisfy its AEPS Act requirements, consistent with this opinion.