**Irwin A. POPOWSKY, Consumer Advocate, Petitioner**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June. 19, 2013.

Decided July 26, 2013.

---

to satisfy the notice requirements for a map change, rendering Ordinance No.2056 void, at this time.

14.  42 Pa.C.S. § 5571.1(b).

Aron J. Beatty, Jennedy S. Johnson and Tanya Jo McCloskey, Harrisburg, for petitioner.

Kriss E. Brown and Krystle J. Sacavage, Harrisburg, for respondent.

Deanne M. O'Dell, Harrisburg, for Direct Energy Services, LLC.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge COHN JUBELIRER.

Pike County Light & Power Company (Pike), an electric distribution company, has a statutory obligation to provide default electric generation service (default service), through its Default Service Plan (Plan), to customers who have not chosen an electric generation company. Pike filed a Petition for Approval of its Default Services Plan (Petition for Approval) with the Pennsylvania Public Utility Commission (PUC), proposing to obtain all electricity for customers who had not chosen another electricity generation provider from purchases on the spot market, where the price varies day to day, according to market forces. The PUC granted Pike's Petition for Approval and reversed, in part, the Recommended Decision of the Administrative Law Judge (ALJ). Irwin A. Popowsky, Consumer Advocate, (Consumer Advocate) argues that the PUC's approval of this Plan violates Section 2807(e)(3.2) of the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. § 2807(e)(3.2), which states that electricity procured for a default service plan must consist of a "prudent mix" of spot market purchases, short-term contracts, and long-term contracts. The Consumer Advocate also argues that certain of the PUC's findings of fact lack substantial evidence. Discerning no error in the PUC's Order, we affirm.

Pike is an electric distribution company that serves approximately 4,700 commercial and residential customers in Pike County.[1] From approximately April 20, 2006, through May 31, 2011, an Aggregation Program was in effect, under which most of Pike's customers became customers of Direct Energy Services, LLC (Direct Energy)[2] as their electricity generation supplier and remained customers of Direct Energy after the expiration of the Aggregation Program. (Petition for Approval at 2 & n.1, 4, R.R. at 7a, 9a.) Pursuant to the Competition Act, Pike is required to provide default service to cus-

---

1. Pike is a subsidiary, ultimately, of Consolidated Edison Company of New York, Inc. (Con–Ed).

2. Direct Energy is the electricity generation supplier for the majority of Pike's customers and supplies approximately 56% of Pike's peak load. (Petition for Approval at 8, R.R. at 13a.)

tomers who have not chosen an electricity generation supplier. To this end, on June 15, 2011, Pike filed its Petition for Approval with the PUC, seeking approval of its Plan, which outlined how Pike would procure default service. (PUC Opinion at 2; Petition for Approval at 1–2, R.R. at 6a–7a.)

Under its prior default service plan, Pike obtained all default service on the spot market, from the New York Independent System Operator (NYISO). For the period covered by the new Plan, June 1, 2012 through May 31, 2014, Pike sought PUC approval to continue procuring default service solely through the NYISO spot market. Pike asserted in its Petition for Approval that, due to the expiration of the Aggregation Program and the small size of Pike's default service customer base, it was difficult for Pike to estimate its default service requirements. Pike stated that, if it overestimated its default service requirements and purchased too much electricity by contract, it would generate stranded costs that it would have to recover from its default service customer base. In addition, because of its small customer base, Pike stated that it was difficult for it to negotiate favorable long-term contracts. Therefore, Pike proposed continuing to source all of its default service on the spot market. (PUC Opinion at 2; Petition for Approval at 3–4, 9, R.R. at 8a–9a, 14a.)

The Consumer Advocate objected to the Petition for Approval and filed its Answer thereto on August 4, 2011. The Consumer Advocate noted that the price of electricity generation on the spot market changes daily and the Consumer Advocate generally believes that a portfolio approach best promotes stability and low cost while complying with the requirements of the Competition Act. The Consumer Advocate suggested that Pike's Plan be examined to determine whether Pike should expand its default service supply to include financial hedges. (Answer at 1–3, R.R. at 24a–26a.) Direct Energy intervened in the proceeding before the PUC on August 8, 2011.

The PUC scheduled an evidentiary hearing for November 1, 2011. However, shortly before the hearing, the parties jointly requested that the hearing be cancelled and agreed to waive cross-examination. On November 7, 2011, the parties filed a Joint Motion for Admission of Testimony and Exhibits, which was granted. (PUC Opinion at 2–3.) Pike introduced the written testimony of Ivan Kimball, the Director of Electricity Supply for Consolidated Edison Company of New York, Inc. (Con–Ed), and Ricky Joe, Project Manager in Con–Ed's Rate Engineering Department. The Consumer Advocate introduced the written testimony of Matthew I. Kahal, an energy, utility and telecommunications consultant. Direct Energy introduced the written testimony of Ronald M. Cerniglia, its Director of National Advocacy.

The ALJ issued her Recommended Decision on February 10, 2012, recommending that Pike's Plan be approved as modified by the Consumer Advocate's proposal of a fixed-priced hedge contract for 1 MW or less of on-peak default service. In making this determination, the ALJ looked to the Preamble of Act 129,[3] which amended the Competition Act, and ascertained that price stability is one of the goals to be achieved by the legislation. (Recommended Decision at 10–11.) Relying on testimony offered by the Consumer Advocate, the ALJ determined that Pike's existing default service pricing structure, procuring power on the spot market, had resulted in substantial pricing volatility.

3. Act of October 15, 2008, P.L. 1592.

(Recommended Decision at 19.) The ALJ recommended including the short-term hedging contract proposed by the Consumer Advocate as a method of introducing greater price stability into Pike's default service pricing. (Recommended Decision at 21.) The ALJ determined that the costs of such a hedging contract would not be excessive, and that Pike could decline to renew any hedging contract if its customer base dropped significantly, leaving it with more power than it could use. (Recommended Decision at 23–25, 27.)

Pike filed exceptions to the ALJ's Recommended Decision, and the PUC issued its Opinion and Order on May 24, 2012. In its Opinion, the PUC stated that the ALJ had relied too heavily on the Preamble to Act 129 and placed too much emphasis on price stability at the expense of lower customer costs. (PUC Opinion at 29.) The PUC determined that requiring a hedge would result in higher customer cost, but provide little benefit. (PUC Opinion at 30.) Therefore, the PUC approved Pike's Plan to continue with spot market pricing as the method that would result in the least customer cost over time. (PUC Opinion at 30, Order ¶ 3.) The Consumer Advocate now appeals to this Court.[4]

On appeal, the Consumer Advocate[5] argues that: (1) the PUC's concerns regarding a fixed-price hedge are not supported by substantial evidence;[6] and (2) the PUC erred as a matter of law in approving Pike's Plan when it included only one of the sources for electricity listed in Section 2807(e)(3.2) of the Competition Act, 66 Pa. C.S. § 2807(e)(3.2).

■ The Consumer Advocate first argues that the concerns expressed by the PUC about a fixed-price hedge are not supported by substantial evidence. The PUC found that the costs of a hedging product for Pike's default customers might continue to rise in the future. (PUC Opinion at 13.) The PUC also found that the cost of a fixed-price hedge might cost customers more than fluctuation in spot market prices. (PUC Opinion at 14.) Our review of the record shows that these findings are supported by substantial evidence.

Mr. Kimball and Mr. Kahal both testified regarding Pike's studies regarding what prices would have been under two different hedging scenarios. Under a 50% on-peak hedging scenario, similar to the 60% hedging scenario proposed by the Consumer Advocate, prices would have been 2% higher in 2007, flat in 2008, 29% higher in 2009, and 3% higher in 2010. (Kahal Testimony at 12, R.R. at 56a.) These calculations did not take into account any cost premium Pike would have to pay due to the small size of a hedge contract. (Kahal Testimony at 12, R.R. at 56a.) Mr. Kimball's testimony showed that the inclusion of a fixed-price hedge would likely increase both total cost and price volatility. (Kimball Testimony at 4, R.R. at 33a.) Mr. Kimball also testified that Pike would have to pay a premium for

4. This Court's "review of a PUC order is limited to determining whether a constitutional violation, an error of law, or a violation of PUC procedure has occurred and whether necessary findings of fact are supported by substantial evidence." *Popowsky v. Pennsylvania Public Utility Commission*, 589 Pa. 605, 622, 910 A.2d 38, 48 (2006).

5. The Pennsylvania Utility Law Project and the AARP jointly filed an *amicus* brief in this

matter, arguing in favor of the Consumer Advocate's position.

6. The Consumer Advocate also argues that there is substantial evidence that a short-term fixed-price financial hedge is feasible. Contrary to the Consumer Advocate's characterizations, the PUC made no finding that such a hedge was not feasible.

a hedge contract due to the small size of any such contract necessitated by Pike's small default service requirement. (Kimball Rebuttal Testimony at 3, R.R. at 103a.) Mr. Kimball further testified that the rise in costs necessitated by such a premium might drive customers out of Pike's default service, further exacerbating the problem. (Kimball Rebuttal Testimony at 4, R.R. at 104a.) This testimony supports the PUC's determination that customer costs would likely be higher if Pike were forced to hedge its costs with a short-term contract. While the Consumer Advocate would like to focus on Mr. Kahal's testimony, particularly where he testifies that the higher 2009 result should be discounted as anomalous, the PUC is the arbiter of credibility and determines the appropriate weight to be given the evidence. *Metropolitan Edison Co. v. Pennsylvania Public Utility Commission*, 22 A.3d 353, 362 (Pa.Cmwlth.2011). Because there is substantial evidence to support the PUC's findings, we cannot overturn those findings on appeal.

■ Next, the Consumer Advocate argues that the PUC erred in approving Pike's Plan when it included only one of the sources for electricity listed in Section 2807(e)(3.2) of the Competition Act. Under the Competition Act, electricity consumers are able to choose their electric generation suppliers in a competitive market. Section 2804(2) of the Competition Act, 66 Pa.C.S. § 2804(2). However, electric distribution companies (EDC) are obliged to provide electricity to consumers where the consumer fails to choose an electricity generation supplier or a contracted supplier fails to supply electricity. Section 2807(e)(3.1) of the Competition Act, 66 Pa.C.S. § 2807(e)(3.1). The EDC must provide this electricity "pursuant to a[PUC]-approved competitive procurement plan."

*Id.* The electricity supplied under the procurement plan must be:

[P]rocured through competitive procurement processes and shall include one or more of the following:

(i) Auctions.

(ii) Requests for proposal.

(iii) Bilateral agreements entered into at the sole discretion of the default service provider . . .

*Id.* At the heart of the current dispute is the Competition Act's provision that:

(3.2) The electric power procured pursuant to paragraph (3.1) shall include a prudent mix of the following:

(i) Spot market purchases.

(ii) Short-term contracts.

(iii) Long-term purchase contracts, entered into as a result of an auction, request for proposal or bilateral contract that is free of undue influence, duress or favoritism, of more than four and not more than 20 years. The default service provider shall have sole discretion to determine the source and fuel type. Long-term purchase contracts under this subparagraph may not constitute more than 25% of the default service provider's projected default service load unless the commission, after a hearing, determines for good cause that a greater portion of load is necessary to achieve least cost procurement. This subparagraph shall not apply to contracts executed under paragraph (5).

66 Pa.C.S. § 2807(e)(3.2). The Plan approved by the PUC consists solely of spot market purchases. The Consumer Advocate argues that, in order to be a "prudent mix" of services, as required by Section 2807(e)(3.2), a default service plan must include at least two of the sources enumerated in Section 2807(e)(3.2)(i)-(iii). The PUC argues that a "prudent mix" of

sources may include only one of the enumerated sources when this is the most prudent course and is likely to incur the least cost over time.

This Court owes deference to the PUC's interpretation of the statutes with whose enforcement it is charged: "the PUC's interpretations of the [Public Utility Code, 66 Pa.C.S. §§ 101–3316, which includes the Competition Act,] . . . [is] entitled to great deference and should not be reversed unless clearly erroneous." *Energy Conservation Council of PA. v. Public Utility Commission*, 995 A.2d 465, 478 (Pa. Cmwlth.2010). Where this Court determines that a given issue "has not been addressed by the legislature, we are not to impose our own construction on the statute as would be necessary in the absence of an administrative interpretation, but review the agency's construction of the statute to determine whether that construction is permissible." *Bethenergy Mines v. Department of Environmental Protection*, 676 A.2d 711, 715 (Pa.Cmwlth.1996). This is particularly appropriate where, as here, "the statutory scheme is technically complex." *Popowsky v. Pennsylvania Public Utility*, 550 Pa. 449, 462, 706 A.2d 1197, 1203 (1997). On the other hand, if the intent of the legislature is clear, effect must be given to the legislature's unambiguously expressed intent. *Bethenergy Mines*, 676 A.2d at 715.

The Consumer Advocate argues that the PUC's interpretation of Section 2807(e)(3.2) is clearly erroneous because it disregards the plain meaning of the term "mix." Put another way, the Consumer Advocate argues that Section 2807(e)(3.2) is unambiguous and requires that more than one of the enumerated sources be included in a "prudent mix." However, Section 2807(e)(3.2) is ambiguous. For instance, none of the parties argues that it would be prudent to include long-term con-

tracts in Pike's Plan. Yet, the Consumer Advocate does not explain why the term "mix" requires a combination of two of the three enumerated sources, but not all three. The current case reveals a latent ambiguity in Section 2807(e)(3.2) where, in the technical judgment of the PUC, prudence precludes a combination of more than one of the enumerated sources and dictates that only a single source be used. The Consumer Advocate argues that the word "mix" must not be read out of the term "prudent mix"; however, the word "prudent" must not be disregarded either. The PUC's application of Section 2807(e)(3.2) does not reflect that it has read the word "mix" out of the term "prudent mix." Rather, the PUC properly *considered* the possibility of including short-term contracts and determined that to do so would not be prudent. We believe the PUC is correct that, in interpreting the term "prudent mix," the PUC must exercise some balance and discretion under the circumstances of the case in order for the "mix" in question to be "prudent." The Consumer Advocate tacitly adopted this approach itself when it did not urge that long-term contracts be included in Pike's Plan. For these reasons, we must offer deference to the PUC's interpretation.

The Consumer Advocate also argues that the PUC's interpretation is clearly erroneous because this interpretation, that a prudent mix of sources for default service may consist solely of spot-market purchases, fails to give proper weight to the importance of price stability. As the Consumer Advocate points out, the Preamble to Act 129 indicates that price stability was one of the goals to be achieved by that act, and that price instability was one of the harms the act was intended to ameliorate:

(1) The health, safety and prosperity of all citizens of this Commonwealth are inherently dependent upon the availabili-

ty of adequate, reliable, affordable, efficient and environmentally sustainable electric service at the least cost, taking into account *any benefits of price stability* . . . .

(2) It is in the public interest . . . to implement energy procurement requirements designed to ensure that electricity obtained *reduces the possibility of electric price instability* . . . .

Act 129, Preamble (emphasis added).

Contrary to the arguments of the Consumer Advocate, however, the record and the PUC's Opinion reflect that the PUC did take price stability into consideration when making its decision. The PUC acknowledged the importance of price stability stating:

> In our *Act 129 Final Rulemaking Order* [interpreting, *inter alia,* the Preamble to Act 129], we found that a default service plan that meets the least cost over time standard should not have, as its singular focus, the achievement of the absolute lowest cost over the default service plan time frame but rather a cost for power that is relatively stable and also economical relative to other options.

(PUC Opinion at 29.) While not discounting the importance of price stability, the PUC concluded that the additional benefits of a financial hedge would not be justified by the additional costs. Such a determination is within the PUC's discretion and, as discussed above, is supported by substantial evidence. Therefore, it will not be disturbed by this Court.

For these reasons, we affirm the Order of the PUC.

Judge McCULLOUGH dissents.

### ORDER

NOW, July 26, 2013, the Order of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby **AFFIRMED.**

### DISSENTING OPINION BY President Judge PELLEGRINI.

The majority affirms the decision of the Public Utility Commission (Commission) to approve a default service plan proposed by the Pike County Light & Power Co. (Pike) that provides for only one of the three sources for its generation supply service: a single spot market purchase from the New York Independent System Operator (NYISO).

I respectfully dissent because that is at variance with the Electricity Generation Customer Choice and Competition Act (Act 129), 66 Pa.C.S. § 2807(e)(3.2), which provides that the default power must include a "prudent mix" of spot market purchases as well as short-term and long term contracts. It provides, in relevant part:

> [E]lectric power procured pursuant to paragraph (3.1) **shall** include a **prudent mix** of the following:
>
> (i) Spot market purchases.
>
> (ii) Short-term contracts.
>
> (iii) Long-term purchase contracts, entered into as a result of an auction, request for proposal or bilateral contract that is free of undue influence, duress or favoritism, of more than four and not more than 20 years. (Emphasis added.)

*Id.*

Unlike the majority, I would hold that the phrase "shall include a prudent mix" is unambiguous that all three of these options must be included in a default plan. First, "shall include" does not mean, as the majority suggests, that all you have to do is "consider" the provision and then decide which products that you can "exclude." "Shall include" means just that—it does not mean "shall consider"—whether you want a product mix or not. Second, to

"mix" necessarily means that you have to mix different things together. If you bought a can of "mixed nuts" that only had peanuts, that would not be mixed nuts but consumer fraud. It would still not be mixed nuts even if it was established that peanuts were better for you than cashews or almonds or any other type of nut just as it is not a "prudent mix" in purchasing energy of one default service product because the Commission believed it would result in lower customer costs. If the General Assembly wanted that, it would have given the Commission that discretion.

Accordingly, because I agree with the Office of Consumer Advocate that Pike's default plan should utilize multiple resources and not a single resource as it currently exists, I respectfully dissent.

Judge McCULLOUGH joins in this dissenting opinion.