IN THE COMMONWEALTH COURT OF PENNSYLVANIA


The Dauphin County Industrial : 
Development Authority, : 
                Petitioner : 
                : 
           v. :   No. 1814 C.D. 2014
                :   Argued: June 15, 2015
Pennsylvania Public Utility : 
Commission, : 
                Respondent : 


BEFORE:    HONORABLE MARY HANNAH LEAVITT, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge


OPINION
BY JUDGE LEAVITT                        FILED: September 9, 2015


          The Dauphin County Industrial Development Authority (Development Authority) petitions for review of an order of the Pennsylvania Public Utility Commission (Commission) approving a joint settlement proposed by PPL Electric Utilities Corporation (PPL).[1] On appeal, the Development Authority contends that the joint settlement does not adequately compensate the Development Authority for the electricity it generates and sells to PPL in violation of applicable statutory law. For the reasons that follow, we reverse and remand.

---

[1] The other parties to the settlement are the Office of Consumer Advocate, the Office of Small Business Advocate, and the Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania (CAUSE-PA). These parties are no longer involved in this proceeding.

## Background

The Development Authority owns and operates a solar energy farm in Dauphin County, Pennsylvania. The Development Authority constructed the farm to advance green energy generation and position Dauphin County as a leader in alternative energy. To construct the farm, the Development Authority invested $8.5 million and incurred another $2.5 million in debt. The farm offers a power source for Dauphin County's emergency management systems and can connect to the County's mobile emergency management unit. In addition, the farm operates in parallel with the electric grid, which allows the Development Authority to sell excess electricity[2] to its energy provider, PPL. Customers, such as the Development Authority, that generate electricity to sell to their respective electricity providers are known as "customer-generators."

There are two types of electricity providers: Electric Distribution Companies and Electric Generation Suppliers. Typically, in a given region, there is one Electric Distribution Company. The Commission appoints that Electric Distribution Company as the default service provider for that region. The default energy provider in Dauphin County is PPL. Accordingly, energy consumers in Dauphin County are automatically enrolled as customers of PPL. However, these consumers can also choose to purchase their electrical service from an alternative

---

[2] Excess electricity is the electricity produced by the farm above and beyond what the Development Authority consumes. Since construction of the farm, the Development Authority has never consumed more power than it has created.

source, *i.e.,* an Electric Generation Supplier.[3] This is true for both customer-generators and "service-customers."[4]

The rates that PPL charges of all customers, whether customer-generators or service-customers, are set by tariffs, which must be approved by the Commission. The rates that Electric Generation Suppliers charge customers are negotiable. Because Electric Generation Suppliers distribute their electricity through PPL, they must pay PPL a non-negotiable fee for this service.

In order to track the amount of excess electricity generated and consumed by customer-generators, PPL provides them a "net metering" service. Net metering employs a bidirectional meter to measure the amount of electricity *used by* the customer-generator and the amount of electricity *generated by* the customer-generator's alternative energy system. If a customer-generator generates more electricity than it uses, PPL purchases the excess electricity by issuing a monthly account credit or remitting an annual cash payment. PPL's cost to purchase excess electricity is passed on to its other customers in its tariff.[5]

In October of 2011, when the Development Authority began using net metering, PPL offered it a choice of two rates per kilowatt hour (kWh) for selling or purchasing electricity: a fixed rate and a Time-of-Use rate. The Development

---

[3] An Electric Generation Supplier has been defined as a "person or corporation ... that sells to end-use customers electricity or related services utilizing the jurisdictional transmission or distribution facilities of an electric distribution company." 66 Pa. C.S. §2803.

[4] The briefs use the term "service-customers" to describe those customers that consume electricity only and do not generate and sell electricity back to the energy grid.

[5] Presumably, after purchasing excess electricity from customer-generators, PPL mixes the electricity it purchases with the electricity it generates. Customers are unaware of the origin of their electricity. PPL, with the Commission's approval, determines the rates it will charge customers, and those rates are based on numerous factors, including PPL's costs to generate or purchase the electricity it sells.

Authority elected a fixed rate, and it was paid approximately 8.441 cents per kWh for the excess electricity it generated. In April 2013, the Development Authority elected the second rate option, *i.e.,* the Time-of-Use rate. To calculate the Time-of-Use rate, PPL uses a weighted average of the number of on-peak and off-peak[6] hours in a year. At the time of the proceedings in this case, the weighted average produced a rate of approximately 13.736 cents per kWh.[7] By the time the Development Authority elected this option, however, the Commission had frozen the rates; accordingly, the Development Authority has remained on the fixed rate at 8.441 cents per kWh.

The Commission approved PPL's initial Time-of-Use program in 2010. In 2011, at PPL's request, the Commission froze the Time-of-Use rates, meaning that no customer could switch from a fixed rate to a Time-of-Use rate. The Commission invited PPL to revise its Time-of-Use program. On May 1, 2012, PPL petitioned the Commission for approval of a Default Service Plan, which included, *inter alia*, a new Time-of-Use program. The Commission approved the majority of the Default Service Plan, but it rejected the proposed Time-of-Use program included therein. The Commission encouraged PPL to meet with interested stakeholders to discuss and resolve the development and implementation

---

[6] On-peak hours are when electricity demand is greatest; off-peak hours are when electricity demand is lowest. On-peak hours are generally the traditional daytime working hours. Off-peak hours are times such as weekends, early morning, and nighttime.

[7] PPL illustrated the weighted average calculation in discovery responses. According to PPL's calculation, 35% of the hours in a year are on-peak and 65% are off-peak. PPL applied this weighting factor to the on-peak rate of 15.389 cents per kWh and off-peak rate of 11.588 cents per kWh applicable at the time, resulting in a rate for net-metered Time-of-Use customers of approximately 13.736 cents per kWh. PPL's calculation is based strictly on the percentage of on-peak and off-peak hours and bears no relation to the precise time a particular customer-generator delivers power to the grid. *See* Reproduced Record at 237a-241a (R.R. ___).

of a new Time-of-Use plan. On August 23, 2012, after discussions with interested parties, PPL petitioned the Commission for approval of a revised Time-of-Use program (pilot program).

Under the pilot program, PPL will no longer provide its customer-generators the option of buying and selling electricity at the Time-of-Use rate. PPL's customer-generators must use a fixed rate for the purchase and sale of electricity. To obtain a Time-of-Use rate, the customer-generator must choose electrical service from an Electric Generation Supplier and negotiate that rate structure. However, Electric Generation Suppliers are not required to offer Time-of-Use rates. Even if Electric Generation Suppliers wish to offer Time-of-Use rates, they must apply to the Commission for permission to do so. If approved, Electric Generation Suppliers then must abide by strict requirements in order to remain eligible to offer Time-of-Use rates. The requirements are onerous.[8]

As of the time the record in this case was compiled, no Electric Generation Supplier had undertaken the steps necessary to be able to offer Time-of-Use rates or expressed any interest in doing so. For this reason, PPL included a contingency plan in its proposal to the Commission. The contingency plan states, in relevant part:

> 48. If no [Electric Generation Suppliers] execute the Participation Form at the initiation of the Pilot [Time-of-Use] Program or if all participating [Electric Generation Suppliers]

---

[8] Before being permitted to offer Time-of-Use rates, Electric Generation Suppliers must "create and maintain a webpage…that provides details about the available [Time-of-Use] rate options," "must provide PPL Electric with an initial report and quarterly reports thereafter describing the [Time-of-Use] rate options being offered," and "are responsible for publicizing and marketing their participation in the Pilot [Time-of-Use] Program and the [Time-of-Use] rate options provided thereunder." ALJ Recommended Decision, May 1, 2014, at 10; Brief of the Development Authority, Appendix B.

opt out of the program or default on the program's requirements, PPL Electric will expeditiously seek approval of a new subsequent [Time-of-Use] proposal and request that the replacement plan be made effective within 60 days. If no [Electric Generation Supplier] qualifies to participate in the Pilot [Time-of-Use] Program or it appears that any or all of the participating [Electric Generation Suppliers] will choose to opt out of the program, *PPL Electric will endeavor to work with an interested but non-qualifying* [*Electric Generation Supplier*] or the opting out [Electric Generation Suppliers] to keep them in the program prior to engaging in the contingency plan described in paragraph 49 below.

49. PPL Electric's subsequent [Time-of-Use] proposal, as discussed in paragraph 48, will contain the following characteristics. First, *the Company will solicit, through a request for proposal ("RFP") process, a single supplier to provide [Time-of-Use] service to customers*. The program also will be a summer-only program (including the months of June, July and August), where the "on-peak" period will be from 2 p.m. to 6 p.m., Monday through Friday, excluding PJM holidays,[9] and all other hours during this summer period will be defined as the off-peak hours. The RFP will determine the summer "on-peak" and "off-peak" rates. Moreover, the rate during the non-summer months will be the then current [fixed rate]. ... PPL Electric also will be permitted to fully recover the costs of implementing the subsequent [Time-of-Use] proposal through the Generation Supply Charge. Finally, parties will have the right to challenge the subsequent [Time-of-Use] proposal.

ALJ Recommended Decision, May 1, 2014, at 14; Brief of the Development Authority, Appendix B (emphasis added). Stated otherwise, under this

---

[9] PJM "is a regional transmission organization (RTO) that coordinates the movement of wholesale electricity in all or parts of 13 states and the District of Colombia." http://www.pjm.com/about-pjm.aspx (last visited August 12, 2015). One of PJM's services is ensuring that on certain traditional holidays, such as Memorial Day and Christmas Day, customers are charged "off-peak" electricity prices, no matter how much electricity is actually used on that day. These days are referred to as "PJM holidays."

contingency plan, PPL, *i.e.,* the "Company" referenced above in paragraph 49, promises that it will "endeavor" to find an Electric Generation Supplier willing to do business with customer-generators on the basis of Time-of-Use rates, should none have chosen to do so when the pilot program goes into effect.

**Procedural History**

The Office of Consumer Advocate and CAUSE-PA filed separate answers to PPL's petition for approval of the Default Service Plan, including the new Time-of-Use proposal. Shortly thereafter, the parties entered into a partial settlement, and it left PPL's pilot program for Time-of-Use rates unchanged. On October 17, 2013, the Development Authority filed a petition to intervene to challenge PPL's pilot program. The Development Authority argued that the pilot program did not satisfy PPL's statutory duty to offer Time-of-Use rates to all customers, including customer-generators. Directing customer-generators to Electric Generation Suppliers, it argued, was not a permissible way for PPL to meet its statutory obligation to offer Time-of-Use rates to all customers and to purchase excess electricity generated by customer-generators at the full retail rate.

The dispute went before Administrative Law Judges Susan D. Colwell and Joel H. Cheskis. On May 1, 2014, the ALJs issued an adjudication recommending that the Commission approve the partial settlement without modification. Noting that PPL's Time-of-Use rate program had been problematic in the past, the ALJs concluded that PPL's proposal "represents an honest effort to overcome these difficulties and to present a pricing option which will give ratepayers an opportunity to save money while shifting load from peak to off-peak times." ALJ Recommended Decision, May 1, 2014, at 29; Brief of the Development Authority, Appendix B.

7

The ALJs saw no problem with the absence of any Electric Generation Suppliers offering Time-of-Use rates. The ALJs wrote:

> The concern that no [Electric Generation Supplier] would offer net metering services has not yet come to fruition, as there is no experience with [Electric Generation Supplier]-related [Time-of-Use] plans in the PPL service territory. There is no reason to assume that no [Electric Generation Supplier] would seek to fill this need. This lack of knowledge is consistent with the very nature of a Pilot program, which is intended to explore the viability of a proposal.

*Id*. at 28. The ALJs criticized PPL's contingency plan as no plan at all. Nevertheless, the ALJs determined that "the issue of whether [Electric Generation Suppliers] will offer [Time-of-Use] rates is not ripe as the Pilot [Time-of-Use] Plan has not gone into effect." *Id*. at 32.

The Commission adopted the ALJs' findings of fact and conclusions of law. The Commission held:

> Upon our review of the Partial Settlement, we find it to be reasonable and in the public interest, and we will approve it. We commend PPL and the other Joint Petitioners for their willingness to explore the possibility of utilizing [Electric Generation Suppliers] to allow the Company to meet its [Time-of-Use] rate requirement, and for their ability to work out a fair and reasonable compromise of the separate interests of each Party. We believe the Pilot [Time-of-Use] Program, as described in the Partial Settlement, will provide PPL's customers with the option of choosing market-based [Time-of-Use] rates that are just and reasonable – an option that has been long overdue in PPL's service territory.

Commission Adjudication at 45. The Commission explained that

> the Pilot [Time-of-Use] Program's use of multiple [Electric Generation Suppliers] rather than a single supplier [is] a particularly attractive model for the provision of [Time-of-Use]

8

service, and has the potential to provide customers with a variety of market-based options.

*Id*. at 46. Agreeing with the ALJs that the proposed contingency plan was not viable, the Commission nevertheless approved the partial settlement because the contingency, *i.e.,* failure of an Electric Generation Supplier to do business with a customer-generator, had not yet occurred. When that happens, PPL will have to submit a plan to the Commission and "parties will have the right to challenge the subsequent proposal." *Id*. at 47 (internal citation omitted).

The Commission rejected the Development Authority's contention that PPL was impermissibly shifting its statutory duty to offer Time-of-Use rates to consumer-generators to an unrelated third party, *i.e.,* an unknown Electric Generation Supplier. The Commission explained:

> [I]t is apparent that [the Development Authority's] main interest in taking service under a [Time-of-Use] rate is to allow it to maximize its cash-out revenue as a net-metered customer by continually generating more electricity than it consumes, thus ensuring that it will be compensated for the excess generation at the higher [Time-of-Use] rate. However, we agree with PPL that the primary purpose of a [Time-of-Use] rate is to encourage customers to shift load from on-peak to off-peak periods. Thus, a [Time-of-Use] rate is primarily meant to affect a customer's *consumption* of power, not a customer-generator's *production* of power.

*Id*. at 51 (emphasis in original). The Development Authority petitioned for this Court's review.

9

On appeal,[10] the Development Authority raises five issues challenging the Commission's approval of PPL's partial settlement. First, the Development Authority contends that the pilot program does not comply with the mandate of Section 2807(f)(5) of the Public Utility Code, 66 Pa. C.S. §2807(f)(5), which requires PPL to offer Time-of-Use rates to all customers, regardless of whether those customers generate electricity. Second, and in the alternative, the Development Authority asserts that the Time-of-Use program is defective because it does not require Electric Generation Suppliers to offer net-metering with Time-of-Use rates to customer-generators, which undermines the purpose of the Alternative Energy Portfolio Standards Act (Alternative Energy Act), 73 P.S. §§1648.1 – 1648.8.[11] Third, the Development Authority argues that the Commission erred in imposing the burden upon the Development Authority to rebut PPL's *prima facie* case in support of the partial settlement. Fourth, the Development Authority contends that the Time-of-Use program approved by the Commission will discourage investment in alternative energy resources. Fifth, the Development Authority argues that the partial settlement is arbitrary and unduly discriminates against customer-generators. The Commission disagrees with all of the Development Authority's positions.[12]

---

[10] Our scope of review of an order of the Commission determines whether there was an error of law, a constitutional violation, or the necessary findings are supported by substantial evidence. *Lloyd v. Pennsylvania Public Utility Commission*, 904 A.2d 1010, 1013 n.4 (Pa. Cmwlth. 2006).

[11] Act of November 30, 2004, P.L. 1672, *as amended*, 73 P.S. §§1648.1-1648.8.

[12] Although PPL and the Commission each filed briefs with this Court, their arguments in opposition to the Development Authority are largely the same. For the sake of brevity we shall refer primarily to the Commission's arguments.

**Mandate in 66 Pa. C.S. §2805(f)(5)**

The Electricity Generation Customer Choice and Competition Act (Competition Act), effective January 1, 1997, added Chapter 28 to the Public Utility Code, 66 Pa. C.S. Chapter 28. In summary, Chapter 28 deregulated the generation of electricity, established certain caps on rates, allowed electric distribution companies to recover their stranded generation costs over a transition period, and created the framework for a competitive retail electric market in which customers could shop and choose among competing Electric Generation Suppliers for their energy needs. In 2008, the legislature amended Chapter 28 in significant ways. *See* Act of October 15, 2008, P.L. 1592, No. 2008-129. The amendment relevant hereto was the requirement that,

> [t]he default service provider *shall offer* the time-of-use rates and real-time price plan *to all customers that have been provided with smart meter technology….* Residential or commercial customers may elect to participate in time-of-use rates or real-time pricing.

66 Pa. C.S. §2807(f)(5) (emphasis added). By statute, smart meter technology signifies "metering technology and network communications technology capable of *bidirectional communication ….*" 66 Pa. C.S. §2807(g) (emphasis added). Stated otherwise, a "smart meter" is a way to achieve net-metering.[13]

---

[13] The Competition Act defines "customer" as a "retail electric customer." 66 Pa. C.S. §2803. A customer-generator is a type of "retail electric customer" because it does not always generate excess alternative electricity. For example, if the sun fails to shine, a customer-generator's solar panels will not satisfy the customer-generator's energy demands, and the customer-generator becomes purely a retail customer.

Relevant also is the Commission's regulation that requires that all customer-generators to receive the same rate options as other customers. The regulation reads, "[a]n [Electric Distribution Company] shall provide net metering at nondiscriminatory rates *identical with respect to rate structure*, retail rate components and any monthly charges *to the rates charged to*

**(Footnote continued on the next page . . .)**

11

The Alternative Energy Act is focused on the electric utility's *purchase of excess electricity* from customer-generators. The purpose of the Alternative Energy Act is to encourage growth and investment in renewable sources of energy. The Alternative Energy Act achieves this goal by requiring that "[e]xcess generation from *net-metered customer-generators shall receive full retail value for all energy produced on an annual basis*." 73 P.S. §1648.5 (emphasis added). Moreover, the statute tasks the Commission with developing "technical and net metering interconnection rules for customer-generators intending to operate renewable onsite generators in parallel with the electric utility grid." 73 P.S. §1648.5.

In accordance with this mandate to develop rules for the purchase of electricity from customer-generators, the Commission promulgated 52 Pa. Code §75.13. That regulation requires an Electric Distribution Company, such as PPL, to offer net-metering to customer-generators and to compensate customer-generators at the "full retail rate." The regulation states, in relevant part, as follows:

> (a) [*Electric Distribution Companies] shall offer net metering to customer-generators that generate electricity on the customer-generator's side of the meter…,* on a first come, first served basis. [*Electric Generation Suppliers*] *may offer net metering to customer-generators*, on a first come, first served basis, under the terms and conditions as are set forth in agreements between [Electric Generation Suppliers] and customer-generators taking service from [Electric Generation Suppliers].

---

**(continued . . .)**
*other customers that are not customer-generators*." 52 Pa. Code. §75.13 (emphasis added). Thus, PPL is required to offer Time-of-Use rates to customer-generators.

***

(c) *The [Electric Distribution Company] shall credit a customer-generator at the full retail rate, which shall include generation, transmission and distribution charges*, for each kilowatt-hour produced…, up to the total amount of electricity used by that customer during the billing period. If a customer generator supplies more electricity to the electric distribution system than the [Electric Distribution Company] delivers to the customer-generator in a given billing period, the excess kilowatt hours shall be carried forward and credited against the customer-generator's usage in subsequent billing periods at the full retail rate. Any excess kilowatt hours shall continue to accumulate until the end of the year. For customer-generators involved in virtual meter aggregation programs, a credit shall be applied first to the meter through which the generation facility supplies electricity to the distribution system, then through the remaining meters for the customer-generator's account equally at each meter's designated area.

(d) At the end of each year, the [Electric Distribution Company] shall *compensate the customer-generator for any excess kilowatt-hours generated by the customer-generator over the amount of kilowatt hours delivered* by the [Electric Distribution Company] during the same year at the [Electric Distribution Company's] price to compare.

***

(i) An [Electric Distribution Company] shall provide net metering at nondiscriminatory rates identical with respect to rate structure, retail rate components and any monthly charges to the rates charged to other customers that are not customer-generators. An [Electric Distribution Company] may use a special load profile for the customer-generator which incorporates the customer-generator's real time generation if the special load profile is approved by the Commission.

13

52 Pa. Code §75.13 (emphasis added).[14]  The regulation mandates Electric Distribution Companies, such as PPL, to do business, *i.e.*, provide net-metering service, to customer-generators.  By contrast, the regulation merely authorizes Electric Generation Suppliers to offer net-metering service to customer-generators.

In its first issue, the Development Authority argues that PPL's proposed Time-of-Use program is defective because it means that a customer-generator can choose service from PPL, but only at the fixed rate.  It can choose service from an Electric Generation Supplier, but without any assurance that it can sell its excess electricity to the Electric Generation Supplier.  According to the Development Authority, this Hobson's choice violates the 2008 amendment to the Competition Act that PPL "shall offer" Time-of-Use rates to all customers.  It also violates the mandate in the Alternative Energy Act that customer-generators "shall receive" full retail value for their excess electricity.  The clear and unambiguous meaning of "shall" in each statute means that the Development Authority must be offered Time-of-Use rates by PPL and be able to sell its excess electricity on the same terms.

The Commission disagrees.  It argues that default service providers are not required, directly, to offer Time-of-Use rates to customer-generators.  Moreover, it argues that its interpretation of the mandate in the Competition Act that the default service provider, *i.e.*, PPL, offer time-of-use rates to customers, and the mandate in the Alternative Energy Act, *i.e.*, to pay customer-generators the "full retail price," is entitled to deference.  The Commission contends that its

---

[14] Westlaw does not display the regulation as it currently stands, but rather displays a proposed amendment to the regulation that, if adopted, will not go into effect until after September 5, 2016.  Lexis has the correct regulation on its website.

interpretation of these statutes advances the Public Utility Code's requirements that all rates charged of customers be "just and reasonable." 66 Pa. C.S. §1301. As the Commission explained in its order:

> The record indicates that, as a net-metering customer taking service under PPL's current [Time-of-Use] rates, [the Development Authority] has derived significant benefit from its ability to be compensated for excess generation at above-market rates, in contrast to net-metering customers who receive service under PPL's fixed-price default service, and receive compensation at a lower [fixed rate]. While [the Development Authority] is entitled to the higher level of compensation it receives under the provisions of PPL's tariff and the current [Time-of-Use] rates, we do not believe it is reasonable for [the Development Authority], or any other customer, to receive the higher cash-out amount at the expense of other Small [Commercial and Industrial] customers, who must subsidize this benefit. Therefore, to the extent that [the Development Authority] seeks to continue receiving [Time-of-Use] service at PPL's current above-market rates, or seeks to have [Electric Generation Suppliers] provide [Time-of-Use] service at such rates, we find such a position to be unreasonable and contrary to the public interest.

Commission Adjudication at 49. Stated otherwise, reducing the amount PPL will have to pay a customer-generator, such as the Development Authority, will reduce the rate PPL will impose on its other customers, *i.e.,* "service-customers."

### a. Administrative Deference

The Commission contends that this Court should defer to its interpretation of the statutory mandate that default service providers "shall offer" Time-of-Use rates to customers. 66 Pa. C.S. §2807(f)(5). We have acknowledged that "[a]s the administrative body charged with implementing the Competition Act, the [Commission] is entitled to substantial deference in the performance of its duties, and the [Commission's] interpretation of the Competition Act should not be

15

overturned unless it is clear that such construction is erroneous." *Pennsylvania Power Co. v. Public Utility Commission*, 932 A.2d 300, 306 (Pa. Cmwlth. 2007) (quoting *George v. Pennsylvania Public Utility Commission*, 735 A.2d 1282, 1288 (Pa. Cmwlth. 1999)). We defer to the Commission's interpretation of an ambiguous statute. *Id*. "However, where [the] statutory language is clear, such interpretive discretion ends and the [Commission] must abide by the statute." *Id*.

*Popowsky v. Pennsylvania Public Utility Commission*, 71 A.3d 1112 (Pa. Cmwlth. 2013), is instructive. There, the Commission approved an Electric Distribution Company's default service plan that procured power from a single source, *i.e*., spot market pricing. The Office of Consumer Advocate challenged the Commission's approval, arguing that the plan violated Section 2807(e)(3.2) of the Competition Act, 66 Pa. C.S. §2807(e)(3.2), which requires that power produced by an Electric Distribution Company consist of a "prudent mix" of power procured through spot market purchases, short-term contracts, and long-term contracts. *Popowsky,* 71 A.3d at 1113. The Commission countered that a "prudent mix" of energy could be derived from only one of the enumerated sources, so long as the Commission believed that source to be the most prudent source of energy.

This Court concluded that it owed deference to the Commission's interpretation of what constitutes a "prudent mix." We explained that "[w]here this Court determines that a given issue 'has not been addressed by the legislature, we are not to impose our own construction on the statute as would be necessary in the absence of an administrative interpretation, but review the agency's construction of the statute to determine whether that construction is permissible.'" *Id*. at 1117 (quoting *Bethenergy Mines, Inc. v. Department of Environmental Protection*, 676 A.2d 711, 715 (Pa. Cmwlth. 1996)). However, "if the intent of the legislature is

16

clear, effect must be given to the legislature's unambiguously expressed intent." *Popowsky*, 71 A.3d at 1117.

The Commission's interpretation of Section 2807(f)(5) is not entitled to deference. Unlike the statute at issue in *Popowsky*, there is no ambiguity in the Competition Act's mandate. It provides, plainly, that "*[t]he default service provider shall offer* the time-of-use rates … to all customers that have been provided with smart meter technology." 66 Pa. C.S. §2807(f)(5) (emphasis added). Our rules of statutory construction require that words and phrases be read according to their common and approved usages. 1 Pa. C.S. §1903(a).[15] The legislature's unqualified use of the words "shall offer" in Section 2807(f)(5) places the burden on the default service provider, in this case PPL, to offer Time-of-Use rates to customer-generators. The legislature knows the difference between a default service provider and an Electric Generation Supplier.[16] Its decision to place the onus on default service providers was neither accidental nor arbitrary. Simply, Section 2807(f)(5) does not authorize a default service provider to pass along this obligation to an Electric Generation Supplier.

---

[15] It states:

> (a) Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition.

1 Pa. C.S. §1903(a).

[16] *See* 66 Pa. C.S. §2807(e)(3.1) ("Following the expiration of an electric distribution company's obligation to provide electric generation supply service to retail customers at capped rates, if a customer contracts for electric generation supply service and the chosen electric generation supplier does not provide the service or if a customer does not choose an alternative electric generation supplier, the default service provider shall provide electric generation supply service to that customer pursuant to a commission-approved competitive procurement plan.")

We disagree with the Commission's contention that an Electric Generation Supplier can be a "default service provider" for purposes of Section 2807(f)(5), even though it is not the default service provider for Dauphin County. A default service provider is defined as follows:

> An electric distribution company within its certified service territory or an alternative supplier approved by the commission that provides generation service to retail electric customers who:
>
> (1) contract for electric power, including energy and capacity, and the chosen electric generation supplier does not supply the service; or
>
> (2) do not choose an alternative electric generation supplier.

66 Pa. C.S. §2803. Default service providers are also known as "providers of last resort." *Pennsylvania Power Co.*, 932 A.2d at 307 n.14. There cannot be multiple default service providers; such multiplicity is antithetical to the idea that a particular energy provider will be the "provider of last resort." While we do not disagree with the Commission's assertion that there are circumstances where an Electric Generation Supplier can be appointed a default service provider, those circumstances are not present here.

Our conclusion that the Commission's interpretation is not entitled to deference is further supported by the Commission's acknowledgement that its interpretation of Section 2807(f)(5) has changed. In a 2010 order, the Commission disapproved PPL's proposed Time-of-Use plan because it excluded customer-generators. The Commission held that the proposal violated 66 Pa. C.S. §2807(f)(5). *Pennsylvania Public Utility Commission v. PPL Electric Services Corp.*, Docket No. R-2009-212278 (March 9, 2010). The Commission observes

that this order was not binding on the Commission in reviewing the partial settlement, citing *Elite Industries, Inc. v. Pennsylvania Public Utility Commission*, 832 A.2d 428 (Pa. 2003). An administrative agency may revise and correct its prior interpretation of a statute. However, it cannot expect that its later interpretation is entitled to very much deference. *See, e.g., Mazza v. Secretary of Department of Health and Human Services*, 903 F.2d 953, 958 (3rd Cir. 1990) (agency's interpretation of its statute is entitled to little deference when it is at odds with a prior interpretation).

### b. Just and Reasonable Rates

We are similarly unpersuaded by the Commission's argument that its interpretation of Section 2807(f)(5) is justified by the statutory mandate to ensure that "[e]very rate made, demanded, or received by any public utility … shall be just and reasonable." 66 Pa. C.S. §1301. The issue *sub judice* does not concern PPL's rates but, rather, the services PPL must offer. The statutory requirement that utility rates be just and reasonable does not authorize the Commission to ignore or alter other statutory directives. *Popowsky v. Pennsylvania Public Utility Commission*, 910 A.2d 38, 53 (Pa. 2006). Utility rates are a function of many factors, such as the costs associated with environmental compliance, the cost to build a power plant and the cost to provide a return to the utility's shareholders. The cost of purchasing electricity from a customer-generator that has invested in the production of green energy is only one of many factors that goes into a tariff. The policy decision expressed in the Alternative Energy Act to encourage the production of renewable energy sources is not conditioned on its producing the lowest possible tariff.

19

In short, the Commission's tariff argument is a red herring. If green energy production increases rates, service customers may be encouraged to choose a Time-of-Use rate, which encourages conservation, another policy goal of the legislature. If the mandate that default service providers purchase excess electricity places excessive pressure on tariffs, then it is for the legislature to address that problem.

## Conclusion

The Competition Act requires PPL to offer Time-of-Use rates to its customer-generators. 66 Pa. C.S. §2807(f)(5). PPL may not satisfy this burden by transferring it to Electric Generation Suppliers. The Commission erred in approving the partial settlement. Because the Development Authority prevails in its first contention, we need not consider its other arguments.

For the reasons set forth above, we reverse the Commission's order and remand for proceedings consistent with this opinion.

_____
MARY HANNAH LEAVITT, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| The Dauphin County Industrial Development Authority, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1814 C.D. 2014 |
| | : | |
| Pennsylvania Public Utility Commission, | : | |
| Respondent | : | |

## **O R D E R**

AND NOW, this 9th day of September, 2015, the order of the Pennsylvania Public Utility Commission, dated September 11, 2014, in the above-captioned matter is hereby REVERSED and this matter is REMANDED for further proceedings consistent with this opinion.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, Judge