# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

NRG Energy, Inc.,           :
           Petitioner      :
                           :
           v.              :    No. 58 C.D. 2019
                           :    Argued: December 11, 2019
Pennsylvania Public Utility Commission, :
          Respondent     :

BEFORE:     HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge

**OPINION BY**
**JUDGE COHN JUBELIRER**            **FILED: June 2, 2020**

NRG Energy, Inc. (NRG) seeks review of the December 20, 2018 Final Opinion and Order (Opinion and Order) issued by the Pennsylvania Public Utility Commission (Commission) in the proceeding on PECO Energy Company's (PECO) proposed Tariff Electric – Pa. P.U.C. No. 6 (Tariff No. 6), in which NRG had intervened. Tariff No. 6 proposed a base rate increase for PECO's electric distribution services. NRG challenged certain cost allocations in Tariff No. 6. PECO, as a default service provider (DSP), is responsible for obtaining sufficient electricity for those of its distribution customers who do not "shop" for an electric generation supplier (EGS) or distribution customers who lose their generation service. NRG owns five affiliate EGS companies that sell electricity to customers

in PECO's distribution service area who choose to shop for their electricity. NRG alleged that PECO's Price to Compare (PTC)[1] was too low, did not reflect all of the costs incurred by PECO for providing this service, and made the distribution rates for PECO's residential customers too high, which placed NRG's EGS companies at a competitive disadvantage. NRG proposed a modification that employed an alternative methodology to allocate a percentage of indirect costs between PECO's distribution and default services, effectively treating those services as two separate sections of PECO's operations. The Commission did not agree with NRG's proposed methodology, accepted PECO's allocation of indirect costs, and approved a partial settlement agreement (Settlement) filed under PECO's Tariff No. 6.

On appeal, NRG argues the Commission erred in accepting PECO's cost allocations and rejecting NRG's alternative methodology because the Commission did not apply the proper burdens of proof; the Commission's approval is inconsistent with, among other things, the Electricity Generation Customer Choice and Competition Act[2] (Competition Act) and prior decisions of this Court and the Commission; and the Commission's determinations are not supported by substantial evidence.

## I. Background

NRG contends that PECO's actions and the Commission's Opinion and Order violate the Competition Act, subsequent regulations, and relevant case law, and allow PECO to use funds to subsidize its default service resulting in an artificially low PTC against which the EGSs must compete. To resolve NRG's arguments, a

---

[1] The PTC is the sum of all unbundled generation, transmission, and other related costs of default service. 52 Pa. Code § 69.1808(a).

[2] 66 Pa.C.S. §§ 2801-2815.

review of the Competition Act, the Commission's efforts to effectuate the Competition Act's requirements, and PECO's history as an electric utility prior to its issuance of Tariff No. 6 is necessary.

### A. The Competition Act

Before the passage of the Competition Act in 1996, electric utilities offered a single, regulated price for generation, transmission, and distribution services. Section 2802(13) of the Competition Act, 66 Pa.C.S. § 2802(13). "These 'bundled' services were performed by one local utility that held a monopoly over its service area. However, to encourage a competitive wholesale electric market and to provide cost savings to consumers, in December 1996, the Competition Act was enacted to establish competition in the sale of electric power." *ARIPPA v. Pa. Pub. Util. Comm'n*, 792 A.2d 636, 642 (Pa. Cmwlth. 2002).

Upon the passage of the Competition Act, bundling was no longer permitted and utility monopolies were broken up. Section 2804(3) of the Competition Act mandated that the Commission "require the unbundling of electric utility services, tariffs and customer bills to separate the charges for generation, transmission and distribution." 66 Pa.C.S. § 2804(3). The generation of electricity ceased to be regulated as a public utility in order to ensure greater competition. 66 Pa.C.S. § 2802(14). Under Section 2806(d) and (e) of the Competition Act, electric distribution companies (EDCs) were required to file a restructuring plan with the Commission that demonstrated the separation and allocation of costs between the distribution, transmission, and generation functions. 66 Pa.C.S. § 2806(d)-(e).

Recognizing that not all customers would shop for electricity, the Competition Act appointed the EDC within each certified service territory to be a DSP. Section 2803 of the Competition Act, 66 Pa.C.S. § 2803. Essentially, DSPs must enter into

contracts to purchase electric generation services that they distribute to their distribution customers who either do not directly contract for generation services with an EGS or whose EGS cannot provide generation services. These customers are automatically enrolled in the default service program until they contract with an EGS to generate their electrical service that their EDC will then distribute.

### B. The Commission's Regulations and 2007 Policy Statement

To effectuate the Competition Act, the Commission enacted various regulations to address default service, the requirements for the PTC, and the procurement process for default service. According to Section 54.185(a) of the Default Service Regulations (Regulations), a default service program must be filed "no later than 12 months prior to the conclusion of the currently effective default service program." 52 Pa. Code § 54.185(a). In accordance with the Regulations, a DSP must file a program with the Commission regarding how it will meet its default service obligations. The program, which must be approved by the Commission, includes various documentation, such as: (1) a default service procurement plan explaining the DSP's strategy for procuring generation supply; (2) an implementation plan identifying the schedule and details of the proposed competitive procurement of default supply; and, most relevant to this case, (3) a rate design plan to recover all reasonable costs of default service. 52 Pa. Code § 54.185(e). In addition, Section 54.187(e) of the Regulations deals directly with the PTC:

> The PTC shall be designed to recover all default service costs, including generation, transmission and other default service cost elements, incurred in serving the average member of a customer class. An EDC's default service costs may not be recovered through the distribution rate. Costs currently recovered through the distribution rate, which are reallocated to the default service rate, may not be recovered through the

4

distribution rate.  The distribution rate shall be reduced to reflect costs reallocated to the default service rate.

52 Pa. Code § 54.187(e).  The Commission issued a Policy Statement (2007 Policy Statement) that listed six general cost elements that should be included in the PTC:

> (a) The PTC should be designed to recover all generation, transmission and other related costs of default service.  These cost elements include:
>
> (1) Wholesale energy, capacity, ancillary, applicable [Regional Transmission Organization] or [Independent System Operators] administrative and transmission costs.
>
> (2) Congestion costs will ultimately be recovered from ratepayers. Congestion costs should be reflected in the fixed price bids submitted by wholesale energy suppliers.
>
> (3) Supply management costs, including supply bidding, contracting, hedging, risk management costs, any scheduling and forecasting services provided exclusively for default service by the EDC, and applicable administrative and general expenses related to these activities.
>
> (4) Administrative costs, including billing, collection, education, regulatory, litigation, tariff filings, working capital, information system and associated administrative and general expenses related to default service.
>
> (5) Applicable taxes, excluding Sales Tax.
>
> (6) Costs for alternative energy portfolio standard compliance.

52 Pa. Code § 69.1808(a).

### C. The 2013 Retail Market Investigation

In 2013, the Commission again addressed the retail electricity market.  The Retail Market Investigation (RMI) "stud[ied] how to best address and resolve issues identified by the Commission as being most relevant to improving the current retail

electricity market." *Investigation of Pennsylvania's Retail Electricity Market:  End State of Default Service*, Docket No. I-2011-2237952 (Order entered February 15, 2013) (RMI End State Order), at 3.  The RMI End State Order acknowledged comments the Commission received related to the further unbundling between the PTC and distribution rates, stating:  "the Commission agree[d] with this concept and has strived to address these issues as they have arisen in distribution rate cases." *Id.* at 21.  However, the Commission chose not to promulgate additional regulations to require further unbundling.  *Id*.

### D. PECO's History as a Utility and Provider of Default Service

In 1997, in compliance with the Competition Act, PECO submitted its required restructuring plan to the Commission.  *Application of PECO Energy Company for Approval of its Restructuring Plan Under Section 2806 of the Public Utility Code*, Docket No. R-00973953 (Order entered December 23, 1997) (Restructuring Order).[3]  The Commission determined that PECO's proposal did not meet the requirements of the Competition Act.  *Id*. at 53.  Relevant here, the Commission concluded that "PECO ha[d] misallocated costs among the three unbundled services" by "assign[ing] the vast majority of Administrative and General (A&G), Overhead and general plant expense to [PECO's] T&D [(transmission and distribution)] rates." *Id*.  Accordingly, the Commission unbundled existing rates for transmission, generation, and distribution services and ordered that the costs be separated so that PECO's generation and distribution facilities operated as "functionally separate divisions." *Id*. at 58.  The Commission also calculated

---

[3] The Restructuring Order may be found at:  http://www.puc.state.pa.us//pcdocs/1235564 .pdf (last visited June 1, 2020).

PECO's "shopping credit," now known as the PTC, against which an EGS would compete in offering generation supply to customers. *Id.* at 41-46, 49-68.

As a DSP, PECO must file default service plans. These plans

> [s]et[] forth how PECO will meet its default service obligations, including a strategy for procuring generation supply and a rate design to recover the costs of providing service. The Commission reviews PECO's default service plans and approves a plan if it is consistent with the Public Utility Code[4] and the Commission's regulations.

(Reproduced Record (R.R.) at 342a.) In its role as a DSP, PECO "conducts competitive procurements and enters into wholesale power contracts and associated services for" its different types of default service customers: residential, small commercial, and medium/large commercial. (*Id.*) For default residential customers, PECO uses "fixed-price, full requirements supply contracts" in which the "winning bidders . . . are responsible for assuming, managing, and covering the financial costs and risks associated with electricity supply for a percentage of residential customers . . . ." (*Id.* at 343a.) PECO cannot recover "[c]osts currently recovered through the distribution rate, which are reallocated to the default service rate." *See* 52 Pa. Code § 54.187(e); (R.R. at 343a). PECO's PTC is audited and reviewed annually by the Commission. *See* 52 Pa. Code § 54.187(f). The Commission has approved PECO's default service plans four times after PECO was appointed as a DSP. The current plan is effective until May 21, 2021, and the Commission's consideration of the proposed plan, and the exceptions, resulted in a 68-page opinion explaining the Commission's review and approval. *See Petition of PECO Energy Company for Approval of its Default Service Program for the Period from June 1, 2017 through May 31, 2021*, P-2016-2534980 (Order entered December 8, 2016).

---

[4] 66 Pa.C.S. §§ 101-3316.

**II. Tariff No. 6**

On March 29, 2018, PECO filed proposed Tariff No. 6 that contained proposed changes to base rates designed to produce a net increase in PECO's annual distribution revenues. The Commission suspended Tariff No. 6 and initiated an investigation into the proposed rate increase, as well as PECO's existing rates, rules, and regulations, which was assigned to two Administrative Law Judges (ALJs).[5] Outside parties intervened in the Commission's proceedings, including NRG and the Office of Consumer Advocate (OCA).[6] Public Input Hearings were scheduled, and direct, rebuttal, and surrebuttal testimony was submitted by multiple parties.

*A. The Settlement*

Prior to a hearing before the ALJs, most of the parties reached the Settlement that agreed to a lower net increase of distribution revenues than originally proposed by PECO, as well as

> a base rate increase, an allocation of that revenue increase to the rate classes, a rate design for each rate class, residential and low-income service matters, the impact of Act 40[, Act of June 12, 2016, P.L. 332, No. 40], which added Section 1301.1 to the [Public Utility] Code, [66 Pa.C.S. § 1301.1,] on the revenue requirement, the establishment of an Electric Vehicle Direct Current Fast Charger [] Rider, the calculation of the Federal Tax Adjustment Credit [] resulting from the [Tax Cuts and Jobs Act] [(]TCJA[)], [Pub. L. 115-97, 131 Stat. 2054 (2017),] and the manner of flow-through of the 2018 TCJA tax savings to customers, a revision to the Rate [High-Tension Power] high voltage discount, as well as various reporting requirements.

---

[5] This suspension and investigation was enacted pursuant to Section 1308(d) of the Public Utility Code, 66 Pa.C.S. § 1308(d).

[6] Some of those outside intervenors have also intervened in this matter before the Court, including the Office of Small Business Advocate, the Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania, the Tenant Union Representative Network and Action Alliance of Senior Citizens of Greater Philadelphia, and the Philadelphia Area Industrial Energy Users Group.

(Opinion and Order at 16.)

The Settlement resulted in a reduced base rate increase, reduced administrative burden, and reasonable revenue allocation. (*Id*. at 16.) The ALJs recommended approval of the Settlement in their Recommended Decision. (*Id*. at 28.) Following the ALJs' recommendation, the Commission approved the Settlement. (*Id*.) The Commission determined that the Settlement was beneficial for consumers and "result[ed] in significant savings of time and expenses for all Parties involved by avoiding the necessity for further administrative proceedings." (*Id*. at 30.) As a result of the Settlement, all but one issue was resolved. Reserved for litigation was NRG's opposition to PECO's allocation of costs. An evidentiary hearing was held, at which the previously filed testimony and exhibits were admitted, and rejoinder testimony of PECO's witness and NRG's witness was presented for cross examination.

### B. NRG's Challenge and Proposed Alternative Methodology

The only remaining issue after the Settlement was NRG's challenge to PECO's proposed allocation of certain indirect costs solely to PECO's provision of distribution services. NRG asserted that the allocation of these indirect costs, specifically: Customer Service; Sales; A&G; Intangible Plant; and General Plant and Common Plant Depreciation/Amortization, (R.R. at 221a), should be split between PECO's distribution and default services and proposed its own alternative allocation methodology. NRG claimed that it was "illogical" for PECO "to allocate all of these indirect expenses to [PECO's] distribution service" and, therefore, an adjustment should be made so that the indirect cost allocation reflects "that PECO provides default service to approximately 66[%] of the residential population in its

9

service area." (*Id*.)  Because NRG's challenge to PECO's proposed rate remained outstanding, a record was created in order to allow a determination on that issue.

### i. PECO's Evidence and Direct Testimony of Jiang Ding

In support of the justness and reasonableness of its proposed rate, PECO presented evidence on its cost allocations and cost-of-service study (COS study), which was performed by Jiang Ding, PECO's Principal Regulatory and Rates Specialist. (*Id*. at 36a-37a.)  Ms. Ding testified that the COS study utilized the cost causation principle to discern the appropriate allocation methods for PECO's distribution system.  Ms. Ding stated that a COS study "require[d] an understanding of the design of the utility's distribution system and how that design relates to the characteristics of the customers it is designed to serve." (*Id*. at 43a.)  Ms. Ding explained the results of the COS study, using the various exhibits produced by PECO, and demonstrated what revenue would be required to sustain distribution service. (*Id*. at 65a-74a.)  Ms. Ding concluded that the "COS study was prepared using an appropriate and well-accepted cost of service method.  The results of [PECO]'s COS study provide[d] a reasonable allocation of PECO's cost of service among its rate classes and [were] an appropriate guide for use in designing PECO's proposed rates." (*Id*. at 74a.)

### ii. NRG's Direct Testimony of Chris Peterson

NRG offered the testimony of Chris Peterson, a forensic accountant who analyzed PECO's residential distribution service and default service rates to support NRG's alternative cost allocation methodology.  Mr. Peterson testified that PECO's cost allocation between default and distribution service should "resemble[] the costs that PECO would incur if it operated a separate default service division." (*Id*. at

10

222a.) Upon calculating the expenses of PECO, Mr. Peterson determined that PECO should reallocate $101,951,549, approximately 51.5% of the indirect expenses, to default service. Mr. Peterson opined that, if NRG's proposed reallocation methodology was not used, PECO's PTC was "understated." (*Id*. at 234a.) Mr. Peterson further opined that it is unfair and misleading to have an artificially low PTC because customers would not be able to accurately compare the PTC price to EGSs' prices. Mr. Peterson explained that increasing the PTC was "necessary to ensure [] customers [that were] shopping for electric generation service in PECO's territory [were] being presented with offers from EGSs to which they c[ould] make apples-to-apples comparisons with PECO's PTC." (*Id*. at 236a.)

### iii. PECO's Rebuttal Testimony of Alan B. Cohn

PECO offered the rebuttal testimony of Alan B. Cohn, PECO's Manager of Regulatory Strategy. Mr. Cohn, who had previously testified before the Commission and other utility commissions, asserted that Mr. Peterson's conclusions demonstrated a "misunderstanding of PECO's default service program[,] as well as utility cost accounting principles applied by th[e] Commission and [did] not support any reallocation of distribution service costs." (*Id*. at 341a.) Mr. Cohn noted that PECO's PTC included all of the costs required by the Commission's 2007 Policy Statement and was in compliance with the Regulations. (*Id*. at 344a-46a.) Mr. Cohn testified that, contrary to Mr. Peterson's assertions, PECO had no interest in a "lower PTC" amount because PECO made "no profit" in providing default service "or standing ready to serve those customers who return to default service after shopping with an EGS." (*Id*. at 348a-49a.) Mr. Cohn explained that Mr. Peterson's treatment of PECO's default and distribution services as separate divisions was inaccurate because default service is "a service to distribution customers in the form of electric

11

generation provided by wholesale suppliers under Commission-approved contracts with PECO to meet the electricity need of those customers who have not chosen an EGS or whose EGS decides to cease providing service to such customers." (*Id*. at 349a.) Citing Ms. Ding's direct testimony, Mr. Cohn stated that Mr. Peterson was assuming costs that were not actually incurred according to Ms. Ding's analyses and the COS study. (*Id*. at 353a-54a.) Mr. Cohn asserted that Mr. Peterson's cost allocation methodology was improper because PECO would continue incurring those costs "regardless of the level of shopping by distribution system customers." (*Id*. at 357a.)

### iv. OCA's Rebuttal Testimony of Clarence L. Johnson

OCA, which was in favor of PECO's position, submitted the rebuttal testimony of Clarence L. Johnson, a consultant who provides "technical analysis, advice, and testimony regarding energy and utility regulatory issues." (*Id*. at 367a.) Mr. Johnson opined that Mr. Peterson's proposed methodology did not follow default service policy and that Mr. Peterson's recommendation "ignore[d] the policy and requirements of the default service." (*Id*. at 368a-69a.) Furthermore, Mr. Johnson explained that it would be unreasonable "to 'force' the default service cost[s] to be comparable to EGS costs" because DSPs hold open auctions to procure sources for their default power supply from generation suppliers and must pass all income through to those generation suppliers. (*Id*. at 370a.) Mr. Johnson noted that PECO may only recover its reasonable costs in providing default service. Treating default service as a separate division would be an "artificial concept," Mr. Johnson opined, because "[n]o such requirement has been placed on [DSP]s." (*Id*.) He specifically noted that

12

PECO does not generate the power or own the facilities that produce the power. PECO conducts auctions to procure the power and passes the power costs through to default service customers. . . . Mr. Peterson's recommendation allocates over one-half of the residential share of indirect costs to default service. Given that most of the default service cost is a pure pass through of purchased power, the magnitude of this re-allocation appears to be unreasonable.

(*Id*. at 372a-73a.)

### v. The Parties' Rejoinder Testimony

The ALJs held an evidentiary hearing on August 21, 2018, at which PECO's witness, Mr. Cohn, and NRG's witness, Mr. Peterson, proffered rejoinder testimony. Mr. Cohn explained that PECO's Energy Acquisition team is responsible for the accounting and administration of PECO's electric distribution system to customers in connection with the wholesale energy market. (*Id*. at 461a.) Mr. Cohn noted that the costs associated with this function are included in the distribution rates because it services all distribution customers, whether default or shopping. (*Id*. at 462a-63a.) Mr. Cohn stated that the costs Mr. Peterson concluded should be reallocated from distribution to default service were "not caused by the allocators he ha[d] chosen." (*Id*. at 463a.) According to Mr. Cohn, Mr. Peterson did not provide any data or basis for the claim that the costs normally assigned to distribution service should be reallocated to default service. Mr. Cohn reiterated that the goal of cost allocation is to follow cost causality and opined that Mr. Peterson's chosen allocators, which have not been used by any utility in this country, had not done so. (*Id*. at 464a.) In addition, Mr. Cohn testified that Mr. Peterson's proposed allocation methodology would result in PECO losing money if its distribution customers shopped for their generation service and opted out of using PECO's default service because PECO would continue to incur costs in providing them distribution service that could not

13

be recovered due to the costs being reallocated to PECO's default service. (*Id.*) In response to Mr. Peterson's contention that PECO's default service could operate as a separate business under its current cost structure, Mr. Cohn stated that "PECO is not permitted to make any profit on default service[,] and therefore it's not surprising that its provision of default service could not function on a stand-alone basis." (*Id.* at 464a-65a.)

Mr. Peterson was cross-examined during the hearing and testified that his suggested reallocation methodology was not exact because "PECO employees do not track their time between default service activities and distribution activities." (*Id.* at 493a-94a.) Mr. Peterson admitted that he was not aware of the standard practice of cost allocation for utilities because he had not previously performed any forensic accounting for electric, gas, or water utilities. (*Id.* at 495a-96a.) Mr. Peterson was asked whether he "determine[d] whether the costs [he] allocated were actually associated with the performance of any default service function." (*Id.* at 494a.) Mr. Peterson responded that he did not. (*Id.*) Mr. Peterson also did not know the standard practice for utilities regarding allocating the costs associated with their A&G functions. (*Id.*) Mr. Peterson testified that he relied on counsel and others who have experience in the utility industry to explain to him, among other things, the Restructuring Order, what the PTC is intended to recover, the Regulations, and the Commission's various orders and statements regarding unbundling of costs. (*Id.* at 497a.)

### III. The ALJs' Recommended Decision

Following the hearing, the ALJs issued the Recommended Decision, recommending the rejection of NRG's proposed reallocation methodology. The ALJs specifically found the following. "PECO is properly allocating costs for the

provision of default service." (Recommended Decision at 124.) "[T]he PTC currently includes all costs incurred by PECO in providing default service. PECO makes no profit from providing default service to distribution customers or from standing ready to serve customers who return to default service after shopping with an EGS." (*Id*. at 127.)

Regarding NRG's alternative methodology, the ALJs did not credit Mr. Peterson's testimony and agreed with OCA's evidence that only "avoidable costs, which are those costs that PECO avoids when a customer switches to an alternative supplier, are properly allocated to its PTC." (*Id*. at 128.) The ALJs credited PECO's evidence, and Mr. Cohn's testimony in particular, that the appropriate method of cost allocation is cost causality, which requires that the costs allocated to a service must be caused by the customer who uses that service, and that the costs Mr. Peterson proposed to reallocate were caused by all distribution customers regardless of the type of generation service they use. (*Id*. at 129.) Furthermore, the ALJs were not persuaded by NRG's argument that the Restructuring Order required PECO to treat the default service and distribution service as functionally separate divisions. The ALJs concluded that the Restructuring Order did not apply to this case because there was no "actual separation," and instead this matter involved a "hypothetical separation of functions that PECO performs as a distribution [c]ompany." (*Id*. at 130.) Accordingly, the ALJs determined that PECO met its burden of proof regarding the allocation of the costs and recommended that NRG's alternative methodology be rejected. (*Id*. at 131.)

## IV. The Commission's Opinion and Order

Following the Recommended Decision, NRG filed Exceptions to which PECO and OCA filed Replies. In reviewing the Exceptions, the Commission cited

precedent that recognized its administrative expertise in utility matters and observed that it had wide discretion in determining the cost of capital in order to reach a rate of return that would be applied in rate cases. (Opinion and Order at 10 (citing *Equitable Gas Co. v. Pa. Pub. Util. Comm'n*, 405 A.2d 1055, 1059 (Pa. Cmwlth. 1979)).) The Commission held that the public utility proposing a rate increase has the general burden of proving that its proposed rate is just and reasonable pursuant to Section 315(a) of the Public Utility Code, 66 Pa.C.S. § 315(a). (Opinion and Order at 11.) However, the Commission held that NRG, as the proponent of its proposed reallocation methodology, bore the burden under Section 332(a) of the Public Utility Code, 66 Pa.C.S. § 332(a), to support that proposal, a burden that did "not shift to the utility simply because such rule or order [was] proposed within the context of the utility's [Section] 1308(d) general base rate proceeding." (Opinion and Order at 13.) The Commission explained that this statutory burden of proof "cannot reasonably be read to place the burden of proof on the utility with respect to an issue that the utility did not propose in its general rate case filing, and which, frequently, the utility would oppose." (*Id.*) Thus, the Commission would not require PECO to prove something it did not propose because doing so would create "an absurd result in interpretation of [the Legislature's] enactments." (*Id.*) The burden placed on NRG, the Commission concluded, required NRG to "present[] some evidence or analysis, during the reception of evidence in the proceeding, tending to demonstrate the reasonableness of the adjustment." (*Id.* at 12.) The Commission further noted that the parties had concurred with the allocation of the burdens in this fashion. (*Id.* at 66.) With these principles set forth, the Commission turned to NRG's four Exceptions to the Recommended Decision.

16

First, NRG argued that "the ALJs erred in determining that PECO successfully met its burden of proof" and that NRG's proposal "should be adopted because . . . it presented evidence and analysis that tends to demonstrate that its proposal is reasonable." (*Id*. at 52.) The Commission found, however, that PECO had submitted sufficient evidence to support the justness and reasonableness of its proposed rate, and NRG had "failed to justify its alternative allocation [methodology for] default service costs." (*Id*. at 69.) Second, NRG argued "PECO ha[d] excluded numerous indirect expenses incurred to operate a business . . . in the calculation of its PTC." (*Id*. at 57.) The Commission rejected NRG's argument, holding that NRG did not "provide sufficient empirical support for any actual known and measurable costs that are not being recovered through the existing PTC,"[7] noting Mr. Peterson's inability to identify any such costs. (*Id*. at 70.) Third, NRG asserted that the ALJs fundamentally misunderstood the purpose of the Restructuring Order and, as a result, disregarded cost allocation principles that require distribution and default services to be treated as if they were two separate divisions. The Commission found no error in not applying the Restructuring Order because, unlike the generation and distribution services at issue in 1997, PECO's default and distribution services are not distinct and separate functions and, thus, do not involve restructuring and unbundling. (*Id*. at 71.) Finally, NRG argued "that the ALJs improperly concluded that the costs NRG seeks to allocate to default service are unavoidable costs." (*Id*. at 63.) The Commission stated that the true measure of cost allocation is cost causality, and that NRG's expert, Mr. Peterson, did not demonstrate that the costs sought to be reallocated were caused by his chosen allocators. (*Id*. at 72.)

---

[7] In its Opinion and Order, the Commission noted that it "ha[d] approved four PECO default service plans, with the current plan in effect until May 31, 2021." (Opinion and Order at 33.) The most recent plan included the current calculations for the PTC.

Ultimately, the Commission held that PECO had supported its rates with credible evidence, while NRG had not presented credible evidence to justify an alternative allocation methodology. The Commission determined "Mr. Peterson's proposal to be inconsistent with the structure of PECO's class [COS] study." (*Id.*) Like the ALJs, the Commission credited PECO's evidence, including Mr. Cohn's testimony, (*id.* at 69), and was unpersuaded by Mr. Peterson's testimony because he did not offer proof of specific costs or follow cost causation principles that govern utility rate design, (*id.* at 70-74). The Commission explained that

> Mr. Peterson assumed a problem existed within the cost allocation of these accounts, assumed that he can locate where that problem resided and assumed that the problem has a clear correlation with either the number of distribution customers that receive default service or the amount such customers pay for default service. This is not a sound basis on which to determine rate responsibility. Indeed, customers move from shopping to default service and back again, but all customers use the distribution services of the Company in essentially the same way. The distinction that NRG wishes to draw between shopping and non-shopping customers is not a definable classification.

(*Id.* at 73-74.)

Moreover, the Commission held NRG did not present evidence that its reallocation methodology would create a more equitable result or that PECO's rate was unfair. (*Id.* at 74.) Because of this, NRG's proposal and the "magnitude of this re-allocation appear[ed] to be unreasonable." (*Id.*) Thus, the Commission "den[ied] NRG's Exceptions and adopt[ed] the ALJs' Recommended Decision . . . ."[8] (*Id.* at 1.)

---

[8] The Commission stated that "[t]he [ALJs'] Findings of Fact and Conclusions of Law are incorporated herein by reference and are adopted without comment unless they are either expressly or by necessary implication rejected or modified by this Opinion and Order." (Opinion and Order at 8.)

18

**V. NRG's Appeal to this Court**

On January 18, 2019, NRG filed a Petition for Review with this Court, seeking review of the Commission's Opinion and Order. NRG generally raised three issues for our consideration: (1) the Commission's Opinion and Order "wrongfully shifted the burden of proof to NRG," (NRG's Brief (Br.) at 15); (2) the Opinion and Order violated the Competition Act, as well as the Regulations, the Commission's rulings regarding the Competition Act, and precedent; and (3) the Commission's Opinion and Order was not supported by substantial evidence. We will address each of these arguments in turn, but first we set forth the general legal principles guiding our review.[9]

### A. *General Legal Principles*

Preliminarily, in reviewing the matter before us,[10] we recognize that the Commission's "interpretations of the [Public Utility] Code . . . and its own regulations are entitled to great deference and should not be reversed unless clearly erroneous." *Energy Conservation Council of Pa. v. Pub. Util. Comm'n*, 995 A.2d 465, 478 (Pa. Cmwlth. 2010) (citing *Popowsky v. Pa. Pub. Util.*, 706 A.2d 1197, 1203 (Pa. 1997) (*Popowsky I*)). Our Supreme Court has consistently instructed that this Court should not "'substitute its judgment for that of the [Commission] when substantial evidence supports the [Commission]'s decision on a matter within the

---

[9] PECO and OCA have intervened and submitted briefs in support of the Commission's Opinion and Order. The Energy Association of Pennsylvania submitted an Amicus Curiae brief also in support of affirming. Interstate Gas Supply, Inc., Retail Energy Supply Association, The R Street Institute, and Vistra Energy Corporation have submitted Amicus Curiae briefs that argue the same points as NRG.

[10] "Appellate review of a [Commission] order is limited to determining whether a constitutional violation, an error of law, or a violation of [Commission] procedure has occurred and whether necessary findings of fact are supported by substantial evidence." *Popowsky v. Pa. Pub. Util. Comm'n,* 910 A.2d 38, 48 (Pa. 2006) (*Popowsky II*).

[C]ommission's expertise,' nor should it indulge in the process of weighing evidence and resolving conflicting testimony." *Id.* at 478 (quoting *Popowsky I*, 706 A.2d at 1201). Similarly, because the Commission is "the administrative body charged with implementing the Competition Act, [it] is entitled to substantial deference in the performance of its duties, and the [Commission's] interpretation of the Competition Act should not be overturned unless it is clear that such construction is erroneous." *George v. Pa. Pub. Util. Comm'n*, 735 A.2d 1282, 1288 (Pa. Cmwlth. 1999). However, when statutory language is unambiguous, we will not give the Commission discretion in its interpretation. "'[W]here [the] statutory language is clear, such interpretive discretion ends and the [Commission] must abide by the statute.'" *Dauphin Cty. Indus. Dev. Auth. v. Pa. Pub. Util. Comm'n*, 123 A.3d 1124, 1133 (Pa. Cmwlth. 2015) (quoting *Pa. Power Co. v. Pub. Util. Comm'n*, 932 A.2d 300, 306 (Pa. Cmwlth. 2007)).

Nevertheless, when a statutory scheme is technically complex, or "[t]he decision at issue[] involve[s] complex financial determinations and weighing and interpreting statistical and economic evidence," the Commission's expertise in such matters allows for "broad discretion" in its interpretations and methods. *McCloskey v. Pa. Pub. Util. Comm'n*, 225 A.3d 192, 202-03 (Pa. Cmwlth. 2020) (internal quotations omitted); *see also Coal. for Affordable Util. Servs. & Energy Efficiency in Pa. v. Pa. Pub. Util. Comm'n*, 120 A.3d 1087, 1095 (Pa. Cmwlth. 2015). This case before us impacts not only PECO's cost allocation for its distribution rates, but also the general ratemaking approved in the Settlement and PECO's current, Commission-approved PTC. With these principles in mind, we consider NRG's arguments on appeal.

### B. Whether the Commission Improperly Shifted the Burden of Proof to NRG

In a base rate case, the burden of proof of the proposed rate is on the public utility. Section 315(a) of the Public Utility Code states that:

> [i]n any proceeding upon the motion of the [C]ommission, involving any proposed or existing rate of any public utility, or in any proceedings upon complaint involving any proposed increase in rates, the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility.

66 Pa.C.S. § 315(a). The public utility must satisfy its burden of proof by a preponderance of the evidence, which "means only that one party has presented evidence that is more convincing, by even the smallest amount, than the evidence presented by the other party." *Energy Conservation Council of Pa.*, 995 A.2d at 478.

In the case before us, PECO is the public utility that proposed a rate change and it had to show the rate was just and reasonable. NRG, as an intervenor, challenged PECO's allocation of indirect costs to PECO's residential distribution service and proposed an alternative cost allocation methodology. It was based on NRG's role as a proponent of an alternative to PECO's proposed cost allocation that the Commission invoked Section 332(a) of the Public Utility Code as also placing a burden of proof on NRG. That section states that: "[e]xcept as may be otherwise provided in [S]ection 315 (relating to burden of proof) or other provisions of this part or other relevant statute, the proponent of a rule or order has the burden of proof." 66 Pa.C.S. § 332(a).

NRG argues it was error for the Commission to invoke Section 332(a) to shift the burden of proof onto NRG in this case, when the burden should have stayed with PECO under Section 315(a). Because of this alleged error, NRG asserts that the

Commission did not require PECO to prove by substantial evidence that its cost allocation proposal was just and reasonable. NRG acknowledges, in its brief, that the Commission has previously placed the burden of producing "some evidence" on the party proposing an adjustment to establish the reasonableness of that adjustment. (NRG's Br. at 18 n.4.) The Commission responds that it properly applied the relevant burdens of proof under Sections 315(a) and 332(a). The Commission argues that it required PECO to prove the justness and reasonableness of its proposed rate, and NRG had a burden of presenting "some evidence" that would tend to show the reasonableness of NRG's alternative methodology. (Commission's Br. at 26-27.)

Section 315(a) of the Public Utility Code imposes a burden on the public utility proposing a new rate to prove that the rate is just and reasonable. 66 Pa.C.S. § 315(a). This burden does not shift from a utility whose burden has been statutorily imposed. *Berner v. Pa. Pub. Util. Comm'n*, 116 A.2d 738, 744 (Pa. 1955). However, although "a utility has the burden of proving the justness and reasonableness of its proposed rates, it cannot be called upon to account for every action absent prior notice that such action is to be challenged." *Allegheny Center Assocs. v. Pa. Pub. Util. Comm'n*, 570 A.2d 149, 153 (Pa. Cmwlth. 1990). Furthermore, Section 332(a) establishes a separate burden of proof than that in Section 315 for those entities that propose a rule or order. 66 Pa.C.S. § 332(a).

Before the Commission, PECO proposed a rate change and, with regard to the PTC, based its allocation on the methodology that had previously been approved by the Commission in the current, and all previous, PTC plans. NRG proposed an alternative allocation methodology that has not been utilized before. Both parties presented evidence to support their respective positions. The Commission

22

interpreted Sections 315(a) and 332(a) and precedent to conclude that PECO "has the burden of proving entitlement to its own cost allocation proposal while the burden of proving that changes should be made to PECO's current cost allocation methodology rests on NRG." (Opinion and Order at 67.) It explained that as the "party proposing an adjustment to a ratemaking claim[, NRG,] bears the burden of presenting **some evidence** or analysis tending to demonstrate the reasonableness of the adjustment." (*Id*. at 66 (emphasis added).) We discern no clear error in this interpretation. First, PECO must, under Section 315(a), prove that **its** proposed rate is just and reasonable, and was required to present direct evidence to support that conclusion. Second, because NRG sought the Commission's approval of **its** alternative to PECO's proposed rate, NRG had to present "some evidence or analysis," (Opinion and Order at 66), to prove that its alternative methodology was reasonable per Section 332(a). If NRG did not bear a burden to present something to support its methodology, it would be difficult, if not impossible, for PECO to respond with evidence explaining why the alternative should not be accepted. In effect, PECO would be "called upon to account for [NRG's] action" without ever having been given notice of the basis of NRG's claims, a result inconsistent with *Allegheny Center Associates*, 570 A.2d at 153.

Acting in its role as factfinder and arbiter of evidentiary weight, *Borough of Duncannon v. Pennsylvania Public Utility Commission*, 713 A.2d 737, 739 (Pa. Cmwlth. 1998), the Commission weighed all the evidence presented, as is required, and concluded that PECO met its burden under Section 315(a). Upon determining that PECO met its burden to prove that its proposed rate was just and reasonable, the Commission separately considered whether NRG presented "some evidence" to support its own position, a standard that NRG acknowledges is correct. (NRG's Br.

23

at 18 n.4.)  Examining NRG's evidence and the rebuttal evidence presented by PECO and OCA, the Commission held that NRG did not meet its burden because NRG's witness, Mr. Peterson, was not credible as to the reasonableness of NRG's proposed adjustment.  In particular, the Commission explained that "[i]n this proceeding, Mr. Peterson could not identify specific additional costs related to providing service, having done **no analysis** of the costs that PECO actually incurs to provide default service."  (Opinion and Order at 71 (emphasis added).)  Furthermore, the Commission stated that Mr. Peterson's reliance on the number of customers paying for default service to determine the proposed rate adjustment showed Mr. Peterson's "misunderstanding of default service" because "customers move from shopping to default service and back again."  (*Id*. at 73-74.)

Based on its credibility and evidentiary weight determinations, the Commission made its final determination in favor of PECO.  That the Commission's determinations were in PECO's favor, rather than in NRG's favor, does not mean the Commission improperly shifted the burden of proof to NRG.  As such, we discern no error in the Commission's application of the relevant burdens of proof in this matter.[11]

> *C. Whether the Commission's Opinion and Order are Inconsistent with the Competition Act, the Restructuring Order, the Regulations, the 2007 Policy Statement, the RMI End State Order and Lloyd v. Pennsylvania Public Utility Commission, 904 A.2d 1010 (Pa. Cmwlth. 2006)*
>
> i.  The Competition Act

---

[11] NRG further asserts that the Commission erred in relying on Section 523(a) of the Public Utility Code, 66 Pa.C.S. § 523(a), to impose the burden on it to prove the reasonableness of its proposed allocation methodology.  (NRG's Br. at 20-21 (citing Opinion and Order at 67).)  Because the Commission's Opinion and Order did not err in applying Section 332(a), we need not address whether the Commission erred in also citing to Section 523(a) under these circumstances.

24

The Competition Act was enacted to promote competition among the electric utilities, provide consumers with more options, and offer separate charges to allow consumers to compare prices and make more informed electricity choices. *See* 66 Pa.C.S. §§ 2802, 2804, 2807. Under the Competition Act, the Commission was tasked with enacting regulations that require EDCs to provide "adequate and accurate" information so as "to enable customers to make informed choices regarding the purchase of all electricity services." 66 Pa.C.S. § 2807(d)(2).

NRG argues that PECO's PTC includes no indirect costs, thus misleading consumers and subverting the very purpose of the Competition Act. NRG asserts that in approving PECO's rate, the Commission is allowing PECO to engage in anti-competitive conduct. The Commission responds that it has repeatedly examined and reviewed PECO's default and distribution services in default service and rate cases and found no violations of the Competition Act. Further, the Commission challenges NRG's contention that PECO is engaging in anti-competitive conduct because PECO cannot earn a profit on default service and, therefore, has no incentive to keep the PTC artificially low as NRG alleges.

Reviewing the Competition Act and the Commission's Opinion and Order, we discern no error in the Commission's determinations. The Competition Act was enacted to unbundle generation, transmission, and distribution, the three main components of providing electricity service. Although NRG contends that PECO's PTC does not provide "adequate and accurate" information as is required for "consumers to make informed choices," *see* 66 Pa.C.S. § 2807(d)(2), the Commission has repeatedly reviewed PECO's default and distribution cost allocations and found them to be reasonable and lawful. In this matter, the Commission thoroughly analyzed PECO's and NRG's proposals and, per its special

25

expertise "[a]s the administrative body charged with implementing the Competition Act," *George*, 735 A.2d at 1288, determined PECO's cost allocations were just, reasonable, and supported by the required evidence. The Commission's determination in this regard was not clearly erroneous and is supported by the record, and, therefore, it will not be overturned.

Additionally, NRG's assertion that the Commission's Opinion and Order allows PECO to engage in anti-competitive conduct was rebutted by the credited testimony of Mr. Cohn. Mr. Cohn testified that, under the Competition Act and the Regulations, PECO cannot make a profit from its default service, and PECO does not seek to compete or maintain certain levels of default customers. (R.R. at 343a, 348a-49a.) The Commission was persuaded by the differences between an EGS and PECO and concluded that an EGS's rate structure "is irrelevant to this proceeding." (Opinion and Order at 69.) As recognized by the Commission, "virtually all of the revenue received from default service customers [is passed through] to wholesale suppliers under contract with PECO." (R.R. at 355a.) "Thus, as it relates to the re-allocation of certain indirect costs that NRG raises, the question is not whether the alternative suppliers' cost structure is the same as [PECO]'s, but whether PECO incurs a cost that should be recovered from all customers." (Opinion and Order at 69.)

The Commission also credited Mr. Johnson's testimony that PECO, as the DSP, must "stand ready" to serve "100% of residential customers at any time." (*Id.* at 44.) Thus, all of PECO's residential distribution customers benefit from this reliable safety net that PECO provides as a DSP. Given the Commission's findings, we cannot find that NRG demonstrated an anti-competitive benefit to PECO resulting from the Commission's approval of PECO's rate change. Accordingly,

26

there was no violation of the Competition Act that requires the reversal of the Commission's Opinion and Order.

### ii. The Restructuring Order

In the Restructuring Order, the Commission ordered PECO to unbundle its costs between its distribution and generation functions, treating them as if they were "functionally separate divisions." (R.R. at 298a.) NRG argues that the Restructuring Order applies in this case, and this Court should reverse the Commission's Opinion and Order because PECO was, once again, improperly allocating all indirect costs to the distribution function. NRG asserts that, in rejecting its argument, the Commission misunderstood the purpose of the Restructuring Order and proceeding. NRG asserts that the Commission, in 1997, determined that generation should be functionally separated from distribution due to its separate costs and employees and analogizes this treatment to the default and distribution services in the case before us. Thus, NRG argues that the Commission erred in holding that PECO's distribution and default services are not separate and distinct. The Commission responds that the Restructuring Order does not have any application in this matter because the Restructuring Order involved a wholly different issue and fact pattern that related to PECO's initial unbundling of its generation and distribution functions in 1997.

In the Opinion and Order, the Commission reviewed the Restructuring Order and determined that it was "unrelated to NRG's proposal." (Opinion and Order at 70.) The Commission explained that the Restructuring Order dealt with two profitable divisions within PECO, distribution and generation, both of which possessed their own employees and could realistically function on their own without the support of the other division. Because "PECO [was] no longer in the generation

27

business," the Commission held here that NRG's proposed separation of PECO's default and distribution services was only hypothetical because actual separation could not be accomplished due to the interrelatedness of the services. (*Id*. at 71.) Unlike PECO's prior generation and distribution services at issue in the Restructuring Order, the Commission concluded that PECO's default service and distribution service are not separate and distinct, and thus the Restructuring Order did not apply to this case.

The Commission has the administrative expertise to review the Competition Act and its own orders and, absent clear error, we defer to that expertise. *See Energy Conservation Council of Pa.*, 995 A.2d at 478; *George*, 735 A.2d at 1288. No such error appears here. PECO is no longer generating electricity as it was in 1997, and, instead, must procure electricity within the regulatory constraints as a DSP due to the mandates of the Competition Act. *See* 66 Pa.C.S. § 2807(e). Mr. Cohn, who worked for PECO in 1997, testified that at the time of the Restructuring Order PECO's generation sector had thousands of employees and generated income that could independently support a generation business. (R.R. at 465a.) Mr. Cohn explained that the same cannot be said for PECO's current default service, a service from which PECO does not earn a profit but passes all revenues to the generation suppliers. (*Id*. at 348a-49a.) PECO, through Mr. Cohn's testimony, established that it considered the costs related to the default and distribution services in setting its rates. The Commission credited the testimony of Mr. Cohn, who stated that "PECO is not seeking to 'maintain' the levels of default service 'achieved,' has no 'default service' operating division, and passes virtually all of the revenue received from default service customers to wholesale suppliers under contract with PECO." (Order and Opinion at 74 (quoting R.R. at 355a) (emphasis omitted).) Therefore, the

28

Commission held that, unlike generation, default service is inherently a part of the distribution service and cannot be independently supported if it was to be functionally separated. Because PECO's default service differs greatly from PECO's former generation sector, we discern no clear error in the Commission's conclusion that the Restructuring Order was not applicable here.

### iii. The Regulations, 2007 Policy Statement, and the RMI End State Order

NRG further argues that PECO's PTC and the Commission's Opinion and Order depart, without adequate explanation, from the Regulations, the 2007 Policy Statement, and the RMI End State Order. NRG asserts that these materials reiterate the goal of the Competition Act and Restructuring Order to "ensur[e] that costs to provide electricity are not embedded in distribution rates." (NRG's Br. at 38.) NRG contends that the Commission is allowing PECO to exclude indirect costs and A&G expenses from its PTC, contrary to the requirements of, respectively, the Regulations and 2007 Policy Statement. As for the RMI End State Order, NRG argues that the Commission was "look[ing] the other way" in order to preserve the "[S]ettlement rather than performing its duty to ensure that PECO's rates are truly just and reasonable." (*Id*. at 41-42.) The Commission asserts it reviewed PECO's unbundling plans since the Restructuring Order and found no violations of that order, its Regulations, the 2007 Policy Statement, or the RMI End State Order.

The Regulations and the 2007 Policy Statement set forth what cost allocation requirements must be in a DSP's PTC. Additionally, the Commission's RMI End State Order recognized the possibility of further unbundling in the future, but did not require further investigations or the promulgation of regulations. Although NRG argues the Commission's Opinion and Order is inconsistent with these materials, we are not persuaded. In this matter, Mr. Cohn credibly testified that PECO's PTC

29

adhered to the Regulations and 2007 Policy Statement. (R.R. at 344a-47a.) Further, as explained by the Commission in its Opinion and Order, the Commission reviewed, in accordance with the 2007 Policy Statement,

> PECO's distribution rates twice – once in 2010 and again in 2015 – and determined that those distribution rates were just and reasonable. In addition, the Commission has considered PECO's default rate design (including the costs that would be recovered in the PTC) four separate times in approvals of PECO's default service programs.

(Opinion and Order at 69.) Mr. Cohn's testimony and the Commission's historical review, and approval, of PECO's distribution rates and default service programs reflect the Commission's compliance with the Regulations and 2007 Policy Statement. We are also unpersuaded by NRG's argument regarding the RMI End State Order because NRG was permitted to present evidence and argue its alternative cost allocation methodology in **this** distribution rate case. In accordance with the RMI End State Order, the Commission "strived to address these issues as they have arisen in distribution rate cases," (RMI End State Order at 21), by reviewing PECO's evidence in this, and other, distribution and default rate cases, as well as NRG's evidence in opposition to PECO's proposed rate. That the Commission accepted evidence, considered the arguments proffered, and made a determination, as prescribed by its regulations, policies, and prior orders, reflects its compliance therewith. Accordingly, this is not a reason to reverse the Commission's Opinion and Order.

### iv. *Lloyd*

Finally, NRG argues that the Commission's Opinion and Order disregards this Court's decision in *Lloyd*. In *Lloyd*, the Office of Small Business Advocate, OCA, and others challenged the Commission's approval of an increase in PPL Electric

30

Utilities Corporation's retail distribution and transmission rates, claiming the rates were discriminatory. The Commission approved rates that were calculated using the principle of gradualism, which limited the distribution and transmission rate increase to 10% across all customer classes, despite there being substantial differences in the rate structure and costs of delivering services between the customer classes. *Lloyd*, 904 A.2d at 1018-19.

In reviewing the Commission's order in *Lloyd*, this Court held that the Competition Act required setting separate rates for each type of service and that the Commission's order directly contradicted Section 2804(3) of the Competition Act by effectively rebundling generation, transmission, and distribution rates when the Commission allowed gradualism to be applied to each service on a total bill basis instead of treating the services as separate. *Id.* at 1013-14, 1020-21. The Court observed that gradualism cannot override other ratemaking considerations or allow one class of customers to subsidize the cost of service for another "without providing a sufficient explanation." *Id.* at 1020. Because the proffered explanation in *Lloyd* was lacking, this Court vacated the Commission's order and remanded for the Commission to set and approve rate structures that were non-discriminatory and reasonable.

NRG argues that the Commission has repeated the error it made in *Lloyd* by allocating all indirect costs to PECO's distribution rates, which, in effect, rebundles PECO's generation and distribution services. NRG asserts that PECO is requiring shopping customers (the customers that only participate in distribution) to subsidize non-shopping customers (those that utilize PECO's default and distribution services) by requiring the former to pay costs that are unrelated to PECO's distribution services. Additionally, NRG argues that PECO's approach does not reflect cost

31

causation principles, particularly the cost of providing service, which is the "polestar" for ratemaking. (NRG's Br. at 42 (quoting *Lloyd*, 904 A.2d at 1020).) NRG maintains that, like the gradualism principle used in *Lloyd*, the Commission improperly allowed "the 'avoided cost theory' advanced by PECO and OCA" to be applied in this case. (*Id.* at 44.) The Commission responds that "NRG's reliance on *Lloyd* is unjustified" because "the Commission has not . . . rebundled generation and distribution." (Commission's Br. at 57.) The Commission asserts that PECO's cost of service methodology relies on "sound cost causation principles." (*Id.* at 58.)

It is apparent from a review of the Opinion and Order that the Commission did not rely on an "avoided cost theory" because the Commission identified "cost causation" as the appropriate method to determine rates and makes no mention of "avoided cost" except when explaining parties' positions. (Opinion and Order at 73 ("[R]ate design is governed by the principle of cost causation. The principle requires that the cost of supplying public utility services is allocated to those who cause the costs to be incurred.").) Furthermore, the Commission's conclusion that "the distinction [] NRG wishes to draw between shopping and non-shopping customers is not a definable classification" because "customers move from shopping to default service and back again, but all customers use [PECO's] distribution services . . ." is supported by the record. (*Id.* at 73-74.) In other words, PECO must "stand ready" to serve all of its distribution customers should the need arise, regardless of the customers' status of shopping or non-shopping, given the fluid nature of shopping and non-shopping customers. (*Id.* at 44.)

PECO, through Mr. Cohn's credited testimony, established that it considered the costs related to the default and distribution services in setting its rates. Mr. Cohn explained that "PECO is not seeking to 'maintain' the levels of default service

'achieved,' has no 'default service' operating division, and passes virtually all of the revenue received from default service customers to wholesale suppliers under contract with PECO." (*Id.* at 74 (quoting R.R. at 355a) (emphasis omitted).) Mr. Cohn further highlighted the fact that PECO has thousands of employees and contractors whose jobs are to **provide distribution service, not default service.** (*Id.*) The Commission credited this testimony and concluded that "[g]iven that most of the default service cost is a pure pass-through of purchased power, the magnitude of [NRG's] re-allocation appears to be unreasonable." (*Id.*) We cannot discredit testimony the Commission has found credible. Unlike in *Lloyd*, the Commission's Opinion and Order here does not rebundle distribution and generation rates, and does not otherwise create "discriminatory rate class structures." *Lloyd*, 904 A.2d at 1020. Accordingly, these are not reasons to reverse the Commission's Opinion and Order.

D. *Whether the Commission's Opinion and Order is Supported by Substantial Evidence*

NRG argues that the Opinion and Order is not supported by substantial evidence because the record contains no evidence that supports the Commission's determination that PECO met its burden of proof. Further, NRG asserts that a utility always has indirect costs related to its provision of default services, and, therefore, a utility cannot value those costs as zero in its PTC, which is what PECO has done here. Last, NRG argues that the Commission erroneously relied on the Settlement to reject NRG's alternative methodology. The Commission responds that the credited evidence supports its findings. The Commission maintains that NRG is asking this Court to reweigh evidence that the Commission, as the ultimate factfinder, has already weighed, which is beyond this Court's appellate review.

In reviewing the Commission's decisions, it is well settled that "the Commission is the ultimate factfinder and makes all decisions as to the weight and

33

credibility of evidence." *Borough of Duncannon*, 713 A.2d at 739. For a Commission finding to be supported by substantial evidence, there must be "more than a mere trace of evidence or suspicion of the existence of a fact sought to be established." *HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 163 A.3d 1079, 1094 (Pa. Cmwlth. 2017), *aff'd*, 209 A.3d 246 (Pa. 2019). Additionally, the record evidence, as well as the inferences that can be logically drawn from that evidence, must be "viewed in a light most favorable to" "[t]he party who prevailed before the" Commission. *United Transp. Union v. Pa. Pub. Util. Comm'n*, 68 A.3d 1026, 1032 (Pa. Cmwlth. 2013).

Here, the Commission heard testimony and considered evidence regarding, not only NRG's proposal, but also PECO's original cost allocations. As set forth above, PECO presented expert testimony from Ms. Ding, the creator of PECO's COS study, as well as other supporting documents and evidence used by Ms. Ding to create the COS study. NRG presented the expert testimony of Mr. Peterson in support of its position that its cost allocation should be adopted. PECO and OCA presented, respectively, the expert testimony of Mr. Cohn and Mr. Johnson. They testified in further support of PECO's cost allocation, including that the PTC contained all that is required by the Regulations and 2007 Policy Statement. Mr. Cohn and Mr. Johnson also noted that PECO cannot earn a profit on its default service, and in opposition of NRG's proposed cost allocation. Furthermore, Mr. Cohn repeatedly referenced PECO's four previous default service plans, which had been approved by the Commission.

In its Opinion and Order, the Commission also referenced these previously approved plans and noted that those rate designs are supported by the traditional principle of cost causation. (Opinion and Order at 73.) The Commission stated that

34

instead of using cost causation, Mr. Peterson "assumed a problem existed" and "assumed" a correlation in the number of customers would solve the "problem." (*Id*.) The Commission did not find this method to be "a sound basis on which to determine rate responsibility." (*Id*.) The Commission, acting in its role as factfinder and arbiter of evidentiary weight, *Borough of Duncannon*, 713 A.2d at 739, weighed the evidence and found PECO's evidence, including the COS study and the testimony of PECO's experts, credible and as supporting PECO's proposed cost allocations.[12]

In contrast, the Commission did not find Mr. Peterson's testimony credible and persuasive. The Commission explained its credibility determinations, citing among other reasons, that PECO's witness, Mr. Cohn, had direct experience in utility rate-making unlike Mr. Peterson, who admittedly had not done any previous forensic accounting for utilities. (R.R. at 340a-41a, 495a-96a.) Further, the Commission explained it was not persuaded by NRG's evidence because Mr. Peterson: did not offer specifics in his proposal, only estimates and assumptions; was not following accepted rate-making principles; and misunderstood the purpose of default service. These explanations are supported by Mr. Peterson's testimony and that of Mr. Cohn and Mr. Johnson. (Opinion and Order at 70-71, 73-74.)

Because matters of credibility and evidentiary weight are for the Commission, this Court may not substitute its view of the evidence for that of the Commission. *See Energy Conservation Council of Pa.*, 995 A.2d at 478 (citing *Popowsky I*, 706 A.2d at 1201). Reviewing the record in the light most favorable to PECO, as we

---

[12] We also note OCA's argument before the ALJs and the Commission that "NRG's proposed allocation would inflate the PTC by allocating hypothetical costs to default service generation, and that this would likely result in increases in EGS prices to the harm of both shopping and non-shopping customers." (Opinion and Order at 59.)

must, *United Transportation Union*, 68 A.3d at 1032, we conclude a reasonable mind would accept PECO's and OCA's credited evidence as sufficient to support the conclusion that PECO's rate and cost allocations were just and reasonable. In contrast, because the Commission rejected NRG's evidence as not credible or compelling, the Commission's finding that NRG did not meet its burden of proof on its proposed cost allocation is likewise supported. Therefore, there is substantial evidence to support the Commission's Opinion and Order.

## VI. Conclusion

The Competition Act was intended to help consumers by creating a more competitive electric market through the unbundling of the three functions of the market. However, the Competition Act also created a safety net, a DSP, to provide electricity for distribution customers should they choose not to shop for generation services or should an EGS fail to provide service. While we acknowledge NRG's desire to promote what it believes would be a fairer market that would enhance competition, the Commission was not persuaded by NRG's evidence and arguments. Therefore, we affirm the Commission's Opinion and Order for the reasons stated above.

---

**RENÉE COHN JUBELIRER,** Judge

Judge Fizzano Cannon and Judge Crompton did not participate in this decision.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

NRG Energy, Inc.,              :
             Petitioner     :
                       :
        v.                 :     No. 58 C.D. 2019
                       :
Pennsylvania Public Utility Commission, :
             Respondent    :

## **O R D E R**

**NOW**, June 2, 2020, the Order of the Pennsylvania Public Utility Commission, entered in the above-captioned matter, is hereby **AFFIRMED**.

_____

**RENÉE COHN JUBELIRER,** Judge